Melvin T. SMITH, Appellee,

v.

Ferron C. LOSEE et al., Appellants.

No. 72-1244.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 23, 1973.

Decided Aug. 22, 1973.

Harley W. Gustin, Sp. Asst. Atty. Gen. (Vernon B. Romney, Atty. Gen., H. Wright Volker and Paul E. Reimann, Asst. Attys. Gen., with him on the brief), for appellants.

Bryce E. Roe, Salt Lake City, Utah, for appellee.

Before LEWIS, Chief Judge, and HILL, SETH, HOLLOWAY, Mc-WILLIAMS, BARRETT and DOYLE, Circuit Judges, sitting en banc.

SETH, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Utah, Central Division, awarding damages to the appellee in an action under 42 U.S.C. § 1983. The suit was based on plaintiff's dismissal as an associate professor from a Utah state junior college.

Plaintiff-appellee, Melvin T. Smith, was an associate professor at Dixie Junior College, St. George, Utah. At all times material the college was subject to the management and control of the Utah State Board of Education. Defendant Losee was the President of the college; defendant Barnum was Dean of Academic affairs, and defendant Peterson was Dean of Applied Arts. The other defendants were members of the Board of Education (hereinafter the Board).

Smith was hired in September 1965 as an associate professor of history and held that position until his dismissal on May 31, 1969. He appears to have been very well qualified for his teaching duties at the college. No issue is raised as to the performance of his classroom duties or as to his scholarship.

In February 1968, near the end of Smith's third year at the college, his department head recommended that he be granted tenure, citing his "outstanding" teaching performance, "dedication to professionalism," and "excellent" dedication to the college and service to the community. Thereafter, the Faculty Personnel Committee, in accordance with the college's "Policy on Faculty Tenure and Promotions," and in accordance with the college's practice, considered the recommendation and voted, three to two, that Smith receive tenure; the two dissenting members, Barnum and Peterson, believed that Smith should be "placed on one year's probation," and reevaluated the following year. President Losee wrote to Smith and told him that he was recommending to the Board of Education that Smith be placed on another year's probation before tenure would be granted, citing the committee's report which "indicates one or two instances which seem to lack professionalism." No conditions to this probationary status were set out.

From a reading of the record, it appears that following receipt of the letter Smith met with Losee to discuss the matter. Losee cited Smith's "anti-administration" attitude, the "Dixie Leavitt matter," the "Phyllis Bell matter," and that Smith had told students that the administration was misusing student funds, in support of Smith's lack of professionalism. As to the latter assertion, Smith has repeatedly denied telling the students this, and the record shows absolutely no evidence or testimony to the contrary. On May 8, 1968, Smith met with the Personnel Committee in Losee's presence and inquired about the statements that he was alleged to have made. No proof was made as to these alleged statements. Losee reread the committee's original recommendation and, in the presence of Losee and Smith, the committee reaffirmed its original recommendation. The vote was again three to two with Barnum and Peterson in the minority. Losee refused to reconsider his position. He therefore "recommended" to the Board of Education that Smith be placed on probationary status for the following academic year. The Board concurred. Although the Board did have the power to overrule the president's "recommendation," the Board's chairman stated that its policy was to have sustained the president in any event.

It is important to a full examination of this controversy that a rather detailed examination be made of the grounds upon which the president Losee refused to "recommend" tenure for Smith, notwithstanding the Personnel Committee's favorable recommendation. As noted above, Losee cited four "instances" of Smith's lack of "professionalism." Smith's purported "anti-administration" attitude appears very difficult to objectively assess. However, the "Dixie Leavitt matter" concerned Smith's activity as a sponsor for the college's Young Democrats. The Young

Democrats, in a 1966 state senate election contest between Dixie Leavitt and his opponent, circulated a flier, under the name of their organization, in which Leavitt's voting record was challenged. Subsequently, Losee told Smith, in a rather informal conversation, that he had had complaints about this activity from a number of townspeople, that he thought Smith was the author of the flier, and that he was misusing the name of Dixie College.

The "Phyllis Bell matter" involved a typing instructor of that name. Smith, as a member of the executive committee of the Faculty Association, had been approached by another typing instructor concerning Phyllis Bell's competence and performance as a typing instructor. Smith presented this to Barnum, the Academic Dean, which Peterson, then Dean of the Applied Arts division of the college, considered to be an interference in an area in which Smith had no jurisdiction.

As for the alleged statements of Smith relating to the college administration's misuse of funds, nothing in the record, apart from the vaguest form of inferential conjecture, supports this allegation.

As to the 1968 denial of permanent status, the trial court found that:

"Losee, Barnum and Peterson, without justifiable cause, rejected the recommendations [of the Personnel Committee] and recommended to [the Board] that permanent status be denied [Smith]. This recommendation was acquiesced in and accepted by the defendant members of the State Board of Education without their having given [Smith] an opportunity to be heard."

Smith continued in his duties as an associate professor of history at the college, under a one year contract and on "probation," as he had for the preceding three years, for the 1968–69 academic year.

In February 1969, the Personnel Committee again met to consider, among other things, Smith's permanent status at the college. Barnum had then become acting head of the department of social sciences under which Smith served. His recommendation to the Personnel Committee referred to the 1968 action and noted that he had never observed Smith's teaching but was influenced by "comments of students and the observations of faculty members." Smith's capabilities as a teacher were never in question. The focus of Barnum's "recommendation" was Smith's "antiadministration demonstrations and allegations." He recommended that Smith be denied tenure.

The Personnel Committee voted four to one not only to deny Smith tenure but also to not renew his contract for the next academic year. The only issue during the committee's discussion was whether Smith had "changed his attitude" since the 1968 action. No witnesses were interviewed, Smith was not given any opportunity to address the committee on his own behalf, nor was the committee given any additional information concerning Smith's conduct during the preceding year.

By letter dated February 25, 1969, Losee informed Smith of the committee's recommendation and that he, in turn, accepting the recommendation, would not recommend that Smith be reappointed to the college's faculty.

Pursuant to the college's "Policy on Faculty Tenure and Promotion," Barnum, on March 12, 1969, wrote to Smith "explaining" the committee's action. This explanation cited Smith's lack of a positive attitude toward the college's administration as evidence of his lack of "professionalism." As further evidence of his lack of professionalism, Barnum's letter reiterated the "Dixie Leavitt matter" which was raised in the 1968 committee meeting and mentioned Smith's "influencing academic instructors against personnel in the vocational-technical division of the College, . . . using instruction time to report certain personal views to students," and that Smith had "led out in creating a schism

in the faculty by unduly influencing several faculty members." No specific instances of these alleged activities were ever presented, either to Smith, to the members of the Personnel Committee, to Losee, to the Board of Education, or to the District Court in its hearing.

In this regard, Losee, in his recommendation to the Board of Education that Smith be denied tenure and that he not be given another teaching contract at the college, detailed certain instances of Smith's activities in support of his position. These included Smith's use of his position as advisor to the Young Democrats "to make a personal attack on Senator Leavitt," and the use of a college publication in the attack, as well as matters arising from Smith's position on the Faculty Association. Losee concluded his recommendation to the Board of Education with a quotation from the Board's tenure policy to the effect that a teacher of Smith's status could be "terminated at the will of the President of the institution." On March 14, 1969, the Board of Education approved Losee's recommendation that Smith be denied tenure and dismissed from the college's faculty.

Smith applied to "sixty or seventy" other colleges for employment but never received an offer. He finally obtained employment at the Utah Historical Society, of which he is now the director.

There are three main issues raised on appeal:

(1) Was Smith refused tenure and future employment for having exercised his First Amendment rights of free speech?

(2) Was Smith denied procedural due process in that he had a right to and was not given a hearing and a written statement of the reasons for his dismissal, and, if so, in that he was not given such a hearing prior to his dismissal?

(3) Are these defendants immune from an award of money damages?

■ The basic requirements of a complaint based upon 42 U.S.C. § 1983 are: (1) that the conduct complained of was engaged in under color of state law, and (2) that such conduct deprived the plaintiff of rights, privileges, or immunities secured by the Federal Constitution and laws. Jones v. Hopper, 410 F. 2d 1323 (10th Cir.). Clearly, the defendants in this case were acting under color of state law when they acted to deny Smith a teaching contract and tenure at Dixie College. The central question, then, is whether in so doing they deprived Smith of the right of free speech guaranteed to him by the First and Fourteenth Amendments.

Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), is somewhat similar and, as here, concerned a nontenured teacher. The Court ordered that the summary judgment be vacated to allow the plaintiff to present evidence to establish his claim, holding that his nontenure status was immaterial to the free speech claim. Despite the broad language of the Court in Perry v. Sindermann, it is clear that a teacher's First Amendment rights are not absolute. As the Court has previously stated in Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968):

"The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

The instant case presents a slightly different problem in that the statements here complained of were not made to the public as in Pickering, but were made at meetings at which only Dixie College administrators and faculty were present. Furthermore, most of the statements complained of were made in Smith's capacity as president or member of the executive committee of the Faculty Association. These statements by Smith that are criticized were expressions of opinion, or the position of the Faculty Association, rather than intended to be statements of fact, as in Pickering. The

record indicates that the purpose of the joint meetings would be to hear the opinions of the faculty and to air grievances.

■■ It is now settled that a non-tenured teacher asserting that he has not been rehired for constitutionally impermissible reasons has the burden of proving that he was dismissed for the exercise of constitutional rights. Fluker v. Alabama State Board of Education, 441 F.2d 201 (5th Cir.). Neither the burden of going forward nor the burden of proof changes until the plaintiff has established that the failure to rehire him was for his exercise of constitutionally protected rights. When his proof so shows, the defense must then assume the burden of showing that the plaintiff's acts materially and substantially interfered with the requirements of appropriate discipline in the operation of the school. Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

In findings of fact Nos. 19 and 23, the trial court found:

"19. The actions of defendants Losee, Barnum and Peterson in denying permanent status and employment to plaintiff were taken for the purpose of punishing him for having supported a particular candidate in a state political election, for having opposed the college administration in his capacity as president and member of the executive committee of the faculty association, and for having expressed opposition to some administration policies during meetings of the Dixie College Faculty Association. The other defendants made no substantial inquiry into the reasons behind the action taken by defendants Losee, Barnum and Peterson, and affirmed their actions solely on the ground that it was their duty to support the president of the college.

\* \* \* \* \* \*

"23. There were no justifiable grounds for denying plaintiff permanent status on the faculty of Dixie Junior College or for denying him employment at the college after the end of the 1968–1969 academic year."

■ The record contains ample evidence that Smith was dismissed and denied tenure for the reasons set out in finding No. 19. There is also substantial evidence in the record to support the finding of the district court that only Losee, Barnum, and Peterson were actively engaged in seeking Smith's dismissal from the college.

Dr. Barnum's reasons for opposing Smith are set out in his memorandum to the Personnel Committee wherein he stated that Smith's probationary status "is more for anti-administration demonstrations and allegations." When asked to explain what he meant by anti-administration, he replied, "outspoken criticism of administrators."

Peterson's testimony at the trial hearing was concerned solely with the "Phyllis Bell matter." This matter was apparently a major factor in Peterson's decision to oppose Smith. In the record this is an insignificant matter.

The defendants did not at trial and do not on appeal assert that Smith was dismissed for anything other than his critical and "negative" attitude toward the administration.

There is certainly substantial evidence in the record to sustain the finding that Smith was refused tenure and reemployment as a reprisal for the exercise of his constitutionally protected First Amendment rights as stated in finding No. 19 above.

It has been pointed out above that plaintiff's First Amendment rights are not absolute. The balancing considerations expressed by the Court in Pickering and Tinker must be taken into account. The plaintiff having proved that his dismissal was grounded upon the exercise of his First Amendment rights, the burden of proof thereby shifted to the defendants to show by clear and convincing evidence, Williams v. Kimbrough, 295 F.Supp. 578 (W.D.La.1969), that the plaintiff's activities and speech

"materially and substantially interfere with the requirements of appropriate discipline in the operation" of the college. Tinker v. Des Moines Independent Community School Dist., 393 U.S. at 509, 89 S.Ct. at 738; Fluker v. Alabama State Board of Education, 441 F.2d 201 (5th Cir.).

In finding No. 23, the trial court found that "[t]here were no justifiable grounds for denying plaintiff permanent status on the faculty of Dixie Junior College or for denying him employment at the college after the end of the 1968–1969 academic year." The defendants in this case did not urge any "justifiable grounds" for Smith's dismissal. They were, and still are, apparently suffering under the misapprehension that Smith, by reason of his lack of permanent status on the college's faculty, could be dismissed for any reason whatsoever, even for the relatively harmless exercise of his constitutional rights. Such, of course, is not the law. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L. Ed.2d 570 (1972).

Taking the entire record and applying it to the balancing test as prescribed in the Pickering and Tinker decisions, it is apparent that the plaintiff's exercise of his First Amendment rights in the manner in which he did far outweigh the interest of the defendants in promoting the efficiency and harmony of Dixie College by the means they chose to do so.

■ It is now established that "the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights." Perry v. Sindermann. If this court's opinion in Jones v. Hopper, 410 F.2d 1323 (10th Cir.), be construed to hold the contrary, it has been modified by subsequent Supreme Court decisions. The findings Nos. 19 and 23 of the district court are supported by substantial evidence. Therefore, Smith has established his claim under 42 U.S.C. § 1983.

Considering these findings by the trial court, and the record generally, we turn to a basic issue on appeal relating to the defenses available to the defendants. Among these the only one present of any significance is that of official privilege.

■ It is important to stress that this is purely a damage action, and this opinion is directed only to such a cause of action. The doctrine of official immunity or official privilege arises in damage suits against public officials. It is a defense which may be asserted to bar the action and, if so, it is an absolute privilege; or it may permit the proof of facts at trial which if present constitute a defense and, if it is of this latter nature, it is a qualified privilege. It is an old doctrine as applied to legislators and to judges. Its age has been questioned as applied to other officials, Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434, but in any event it may be said to have existed at common law.

The Supreme Court has considered the doctrine of official privilege on several occasions, so the history is well developed in its opinions and need not be repeated here. See Bradley v. Fisher, 80 U.S. 335, 20 L.Ed. 646; Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L. Ed. 1019; Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434; Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492; Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288; Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577. These cases discuss absolute privilege. The reason for the rule has been again recently expressed by the Court in Doe v. Mc-Millan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912, as follows:

"The official immunity doctrine, which 'has in large part been of judicial making,' Barr v. Matteo, 360 U.S. 564, 569, 79 S.Ct. 1335, 1338, 3 L.Ed. 2d 1434 (1959), confers immunity on government officials of suitable rank for the reason that 'officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts

done in the course of those duties— suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.' *Id.*, at 571, 79 S.Ct. [1335] at 1339. The official immunity doctrine seeks to reconcile two important considerations—

"'[O]n the one hand, the protection of the individual citizens against pecuniary damage caused by oppressive or malicious action on the part of officials of the Federal Government; and on the other, the protection of public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities.' *Id.*, at 565, 79 S.Ct. [1335] at 1336."

Considering the purpose and reason for the doctrine as above expressed, it is applicable today with the complexity of government, with the growth of commissions and boards, and with broad and important duties and responsibilities assigned to such panels. Many of the important governmental functions, especially those relating to various institutions, are placed in boards of local citizens who give their time and talents usually without compensation. This volunteer talent has come to provide a significant part of the important decision-making, policy-making functions in today's government. These boards are supported by full-time and paid officials charged with the day to day administration of the particular institution or group of institutions.

As stated in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434, the doctrine of official privilege has grown out of case law, except the absolute privilege afforded to members of Congress by the Constitution. Thus the doctrine has adjusted to changes and to needs, within its basic purpose. As above indicated, the breadth and the procedural manner in which it may be asserted varies depending upon the nature of the function or duties with which the public official is charged. This variation will be hereinafter further considered.

■ The doctrine has not been eliminated nor significantly changed in its application to suits brought under the Civil Rights Act § 1983. The Supreme Court held in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, in reference to the privilege afforded a judge:

"We do not believe that this settled principle of law was abolished by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights. The legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities. Accordingly, this Court held in Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), that the immunity of legislators for acts within the legislative role was not abolished. The immunity of judges for acts within the judicial role is equally well established, and we presume that Congress would have specifically so provided had it wished to abolish the doctrine."

Thus the rule must be here recognized and applied. It is one which has been formulated and used in the federal courts; it must be a "federal" one because the federally created cause of action cannot be restricted by state laws or rules relating to sovereign immunity nor to official privilege. The Supreme Court in the cases cited herein has discussed only absolute privilege.

■ It is apparent that there is a collision between the doctrine of official privilege, and section 1983 of the Civil Rights Act. There is coexistence as the Supreme Court has said, but the interaction is not easy to trace, and the points where it occurs are elusive in any particular case. Its consideration must also

be related to the Eleventh Amendment problems which are inherent in most if not all of the cases under the Act. The Civil Rights Act refers to "persons," but is restricted to acts "under color" of state law, etc. Thus these "persons" must be, almost without exception, state or local officials. However, under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, they cannot be so acting or the action is barred under the Eleventh Amendment. Their acts are thus enough beyond their proper official functions to satisfy Ex parte Young, but still must be under enough official "color" to come within the Civil Rights Act. The privilege doctrine is restricted to acts or duties within the scope of the official's powers—the official must be acting on a matter within the ordinary exercise of his duties. This requirement must also be accommodated to Ex parte Young. Thus we have this interrelation of these several concepts and doctrines pertaining to the duties or powers of the official, and to the particular act concerned.

The scope of the official privilege rule, or the extent of its application to a particular official, varies depending upon the nature of his duties and functions. We have described the absolute privilege of legislators, judges, judicial officers, and some executives which may be asserted as a plea in bar. The doctrine is applied in a somewhat different form to other officials—a qualified privilege—whereby in an action it may be asserted as a matter of defense, but it is "qualified" in that proof to support the defense is required. This proof is often lack of malice, or good faith, or some similar showing of good and proper cause for the act complained of. If such a defense can be established during the course of the trial, the jury or judge must then find for the defendant. This qualified privilege thus does not meet that element of the purpose of the rule that the official should not be required to expend time in the defense of litigation brought against him, but it is in accord with the other elements.

A qualified defense has been recognized to be available to police officers in an action brought against them under the Civil Rights Act. Thus the Supreme Court, in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, said:

"We hold that the defense of good faith and probable cause, which the Court of Appeals found available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under § 1983."

It is apparent that "good faith" and "probable cause" have been long recognized defenses to actions for false arrest and totally unrelated to Civil Rights Acts issues. The above reference to the "defenses" may not be a reference to the privilege doctrine as such. The Court, however, mentions them in the same case wherein it states that the defense of official immunity has not been removed by the Civil Rights Act.

The cases considering the nature of official privilege have recognized that its scope or the extent to which it may be asserted as a defense is related to the duties of the official concerned. The Supreme Court considered this again in Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912, and stated:

"In the Barr case, the Court reaffirmed existing immunity law but made it clear that the immunity conferred might not be the same for all officials for all purposes. Id., 360 U.S. at 573, 79 S.Ct. [1335] at 1340; see also Tenney v. Brandhove, 341 U.S. at 378, 71 S.Ct. [783] at 789, 95 L.Ed. 1019; Dombrowski v. Eastland, 387 U.S. 82, 85, 87 S.Ct. [1425], 1487, 18 L.Ed.2d 577 (1967). Judges, like executive officers with discretionary functions, have been held absolutely immune regardless of their motive or good faith. Barr v. Matteo, supra, 360 U.S. at 569, 79 S.Ct. 1335; Pierson v. Ray, 386 U.S. 547, 553–555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). But policemen and like officials apparently enjoy a more limited privilege. Id., at

555–558, 87 S.Ct. 1213. Also, the Court determined in *Barr* that the scope of immunity from defamation suits should be determined by the relation of the publication complained of to the duties entrusted to the officer. Barr v. Matteo, supra, 360 U.S. at 573, 574, 79 S.Ct. 1335; see also the companion case, Howard v. Lyons, 360 U.S. 593, 597–598, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959). The scope of immunity has always been tied to the 'scope of authority.' Wheeldin v. Wheeler, 373 U.S. 647, 651, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963)."

The Court there also said:

"Because the Court has not fashioned a fixed, invariable rule of immunity but has advised a discerning inquiry into whether the contributions of immunity to effective government in particular contexts outweighs the perhaps recurring harm to individual citizens, there is no ready-made answer as to whether the remaining federal respondents—the Public Printer and the Superintendent of Documents —should be accorded absolute immunity in this case."

The Court had previously, in Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434, a defamation suit, said in effect that the greater the range of responsibilities and duties and the wider the scope of discretion, the greater was the need for the privilege. Also that the matters and things committed to the officials' control or supervision must provide the "guide in delineating the scope of the rule . . . ." The statements in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, do not restrict the scope of Barr v. Matteo on this point and its references to the Act have been somewhat adjusted as to defenses by Pierson v. Ray.

It is obvious that the doctrine of official privilege has not been discussed in a number of Supreme Court cases wherein school boards are the defendants. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; Pickering v. Board of Education, 391 U.S. 563,

88 S.Ct. 1731, 20 L.Ed.2d 811, and others. Some of these cases had causes of action for damages and some did not. As to this point the fact that the issue was not raised or not treated is a consideration, but silence is always a difficult factor in which to find guidance. Qualified privilege is after all a defense, and it would not be expected to be discussed if not directly raised. We are persuaded by the extended treatment of the issue in Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912, where it necessarily was a basic issue. It there, of course, arose under the Speech or Debate Clause whereunder absolute immunity was raised, but the statements in the opinion when taken with the holdings of Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, give some direction. The Court, however, has in its opinions considered only absolute privilege, with what may possibly be an exception in Pierson v. Ray.

Many decisions analyze the ministerial versus the discretionary functions as the determining factor, see Carter v. Carlson, 144 U.S.App.D.C. 388, 447 F.2d 358, but as we have indicated in Franklin v. Meredith, 386 F.2d 958 (10th Cir.), this is an important factor, but it must be evaluated together with the purposes and need for the rule. This must be done with the more general considerations indicated in the recent Supreme Court opinions above referred to. We recognize that the Second Circuit has apparently refused to recognize the privilege doctrine in actions under section 1983, or has suggested it be used sparingly. Sostre v. McGinnis, 442 F.2d 178 (2d Cir.). The Seventh Circuit has equated success in showing a justifiable cause or grounds with the required showing for immunity, speaking apparently of absolute privilege. McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir.). The Sixth Circuit in Nelson v. Knox, 256 F.2d 312 (6th Cir.), advanced a "good faith" test.

The defendant members of the Board of Education are charged with broad duties and given extensive powers

under the Utah statutes. These duties and powers, within their limited subject matter are not greatly dissimilar from those of a legislative body. They are required to formulate rules and regulations for the institutions, to establish and announce policies on fundamental matters. As we have seen, the scope of the defense afforded police officers as to arrests is "good faith and probable cause." This test certainly existed long before the revived interest in the Civil Rights Act, but we must consider it as of some direction in this action. This test applied to one of the officer's most important acts in relation to a particular individual and in the general performance of his duties.

Considering all the factors, and especially the extent of their duties, the defense available to members of the Utah State Board of Education must lie somewhere in the area between that of legislators and of police officers. These two are of course not the extreme positions, but are mentioned because they are defined positions in the decisions of the Supreme Court. We thus hold that the defendant board members were entitled to a qualified privilege as a defense in this damage action. This defense may be established, and was here so done, by an affirmative showing that the decision not to renew or to discharge was board action representing an exercise of its discretion vested in it by state law, made in good faith, and without malice, when the official facts before them showed a good and valid reason for the decision although another reason or reasons advanced for nonrenewal or discharge may have been constitutionally impermissible. Under this test no damages are here recoverable against the defendant members of the school board.

This holding applies the official privilege doctrine within the general definitions laid down by the Supreme Court, and within the "intent" references in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492. If the privilege defense is not given its proper scope, the consequences are the same as applied in the Eleventh Amendment cases because there results an interference with the proper administrative functions of the state. It is here critical that the action complained of was taken by the board members in response to a mixture of many different and unrelated reasons advanced for and against the discharge of plaintiff. The board members reached their conclusion thereon and acted. The plaintiff points out that one of the defendant board members testified as to a matter of opinion to the effect the board would have followed the recommendation of defendant Losee in any event. We do not attach particular significance to this testimony when taken in the context of the entire record, and its speculative character.

The defendant Losee, President of the college, defendant Barnum, Dean of Academic Affairs, and defendant Peterson, Dean of Applied Arts, are each in a somewhat different position under the factors herein considered. At the outset, it should be noted that the trial court found actual malice to support punitive damages to have existed in defendants Losee and Barnum as to plaintiff. This is supported by the record. Thus under anything short of absolute privilege, recovery would be possible if damages were proven. They, of course, had no such absolute privilege.

■ As to defendant Peterson, the trial court found that his actions (together with those of defendants Losee and Barnum) were taken for the purpose of punishing the plaintiff for having supported a particular candidate in a state political election, and for other reasons relating to his First Amendment rights. This finding is supported in the record. With such a finding, he is liable for actual damages but not for punitive damages.

■ As to proof of damages, the record contains no evidence to support an award of general damages. As to this matter, plaintiff testified that he attempted to find a teaching position at other schools but was unable to do so.

He did find another position with the state at a comparable or better salary. He is entitled to no damages just by reason of a change of jobs. There was no showing as to any effect resulting from the inability to find a teaching position. There was evidence that he was, in the words of the trial court, harassed by defendants Losee and Barnum. However, there is no pendent cause for defamation or any related cause. Many, if not all, of the incidents complained of appear to have taken place after the discharge was announced, although under the record it is difficult to determine just when the actual termination was effective. We must hold that the award of general damages was without adequate basis in the facts, and must be set aside.

 As indicated above, there was evidence to support the award of punitive damages. Also there was evidence as to the actual costs of the move which had to be made by plaintiff following his discharge, and this is recoverable against defendants Losee, Barnum, and Peterson.

The judgment is reversed as to defendants Backman, Allred, Baker, Snow, Morrill, Tanner, Ure, Riddle, and Richards. The judgment insofar as it awards general damages is also reversed. The judgment is affirmed insofar as it awards actual damages in the amount of $4,100.00 against defendants Losee, Barnum, and Peterson, and affirmed insofar as it awards punitive damages in the amount of $2,500.00 against defendant Losee and also $2,500.00 against defendant Barnum. It is so ordered.

BARRETT, Circuit Judge (concurring in part and dissenting in part).

I concur in the *result* reversing the damage judgments as to appellants Backman, Allred, Baker, Snow, Morrill, Tanner, Ure, Riddle and Richards, individually, while serving as members of the Utah Board of Education, and *dissent* from the opinion insofar as it affirms the trial court awards in favor of

Smith and against President Losee and administrators Barnum and Peterson in actual damages of $4,100.00 and punitive damages against Losee and Barnum, respectively, in the amount of $2,500.00.

I agree with much of the learned reasoning and the analysis of the various legal factors set forth in the majority opinion. However, I am extremely fearful that we have created a precedent which will ultimately permit the faculty of our educational institutions to "call all of the shots" from top to bottom. Not only does this possibility run contra to every principle I have heretofore known in fact and in law, but from a philosophical and historical basis it cannot pass muster. It is because we have now ventured into a previously uncharted sea (insofar as this court is concerned) that I must indulge more space and verbage than I would otherwise desire.

Congress, in the enactment of the Civil Rights Act, intended that the courts construe their provisos liberally in order to protect federal constitutional rights, privileges and immunities. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961). 42 U.S.C.A. § 1983 was derived from the Ku Klux Klan Act. It was intended to protect every citizen of the United States or other persons within its jurisdiction against such deprivations by any other person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory" rendering the offender " . . . liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Obviously, Congress delegated to the courts the determination of " . . . all necessary and appropriate remedies." Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 239, 90 S.Ct. 400, 24 L. Ed.2d 386 (1969).

The majority opinion recognizes that there is little precedent for money damage judgments arising out of Civil Rights suits. Most of the relief granted is in the nature of injunctive or declaratory relief. A close examination of the

reported damage judgment award cases conveys a clear impression that the condemned acts were malicious in nature and performed in reckless and wanton disregard for the known rights of others. A person acting so abusively is not entitled to any immunity or privilege from a money judgment award. Such acts are maliciously motivated. That, I suggest, is the standard applied by the Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), even though the action there was one of libel. There the Court held that the First Amendment shields a newspaper from damage liability unless the publication is undertaken with actual malice. I see no justification for application of any less stringent standard of proof against the defendants-appellants in the case at bar.

I concur in the *result* reached in the majority opinion reversing the trial court judgments against each of the nine members of the Utah State Board of Education. Under Utah law the doctrine of sovereign immunity grants immunity to those officers and employees who perform acts within the scope of their official authority, *so long as the acts are done without malice.* Bingham v. Board of Education of Ogden City, 118 Utah 582, 223 P.2d 432 (1950); Logan City v. Allen, 86 Utah 375, 44 P.2d 1085 (1935). In *Bingham, supra,* the Court stated:

> The maintenance of a system of public schools within the state is a matter of statewide interest. Boards of education are created by the legislature to perform the function of educating the children residing in the state. *As agencies of the state*, their activities are restricted to the duties and powers specifically granted to them. They act without profit, are supported by taxes, *and act solely in a governmental capacity.* The legislature has not imposed responsibility upon them and this court cannot adopt a refined distinction between two torts, one sounding in mere negligence and one sounding in aggravated negligence

and by such a judicial construction . . . impose liability in the other. (Emphasis ours) 223 P.2d at 437, 438.

After the Board concurred in Smith's contract non-renewal, Smith asked the Board to provide him a hearing. The Board, with Smith's approval, made a special trip to Dixie College to hear him out. The last minute Smith declined to appear because he had been advised by someone that he should have counsel. The Board thereafter agreed to hear Smith out at a meeting to be held in Salt Lake City. Smith had agreed to appear and had requested the hearing. Again, Smith failed and neglected to appear before the Board. While it is unlikely that the Board would have reversed its position concerning Smith's non-tenure, non-renewal status, still the fact remains that Smith, after requesting a hearing before the Board, displayed bad faith in not availing himself of the hearing opportunities afforded him. That alone should foreclose his claims.

In those states in our Circuit where the doctrine of sovereign immunity has not been abrogated insofar as official acts of members of a school board or board of education—trustees or educational administrators is concerned—I believe that the rule laid down in State Highway Commission of Wyoming v. Utah Construction Company, 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1929) protects them from any personal liabilities because they serve as the state's alter ego and, of course, the state is not a "person" subject to a Civil Rights suit under § 1983. Williams v. Eaton, 443 F.2d 422 (10th Cir. 1971). I am aware, however, that certain language in Harris v. Tooele County School District, 471 F.2d 218 (10th Cir. 1973), casts considerable doubt on the efficacy of the state sovereign immunity doctrine in federal actions for redress under the Civil Rights Act. I observe, however, that we may have placed form over substance in avoiding the immunity challenge head-on by distinguishing in Williams v. Eaton, *supra,* the immunity to which the individual members of the University of

Wyoming Board of Trustees were granted *simply* because they were sued in their official capacities and not *individually* while serving in those official capacities. This, to me, is form over substance.

I do not believe that the federal Civil Rights Act overrides the sovereign immunity grants recognized and nurtured in the wisdom of the legislative bodies and courts of the respective sovereign states, as guaranteed them by the federal Constitution (those powers not expressly granted to the United States are reserved to the states) and the protective armor of the Eleventh Amendment. In those states within our Circuit where the sovereign immunity doctrine is viable in relation to Boards of Education, school administrators, and other public officials, I would come down on the side of the states regardless of the fact that the action is based on the federal Civil Rights Act. But because there is no uniformity throughout the states in our Circuit on the application of and the extent of the doctrine of sovereign immunity, I am directing my future remarks relating to the basis for reversal by the majority opinion pertaining to the damage judgment awards entered against the individual members of the Utah State Board of Education to the doctrine of official privilege.

The majority opinion holds that these individuals, as Board members, have available a privilege defense which "must lie somewhere in the area between that of legislators (absolute) and of police officers (good faith and probable cause)." I recognize the difficulties in this treacherous area of "balancing" rights, but I suggest that we can and should "pin down" that privilege not only as it applies to the members of the State Board of Education, but with equal application to the appellants President Losee and administrators Barnum and Peterson of Dixie College.

First, I cannot stress strongly enough that each of these defendants-appellants were at all times serving in their official capacities exercising a delegated power of the sovereign, entirely *discretionary* in nature under statutory authority. We recognized the significance of such authority in Franklin v. Meredith, 386 F.2d 958 (10th Cir. 1967). The crux of this and other like decisions is that acts which are *discretionary* in nature—as distinguished from those which are *ministerial* in nature—must, of necessity, be entitled to a governmental immunity of a limited nature. For a thorough discussion of what constitutes "public offices" with attendant attributes, see State ex rel. McIntosh v. Hutchinson, 187 Wash. 61, 59 P.2d 1117 (1936). In my judgment the same standard of official privilege immunity granted members of the Board of Education is applicable to the appellants Losee, Barnum and Peterson. They are immune from Civil Rights damage judgments unless they perform their *discretionary* functions relative to teacher employment, assignment, tenure and contract renewal, with *malice*. The majority opinion does not discuss what, if any, privilege Losee, Barnum and Peterson may be entitled to because it concurs with the trial court holding that each of the three acted maliciously and wilfully in disregard of Smith's rights. The practical effect of leaving the standard of privilege undefined insofar as it relates to those administrators charged by law to exercise discretion in the subject areas to inform and advise the Board is that henceforth I am fearful that such persons shall no longer serve the intended public interest. At the risk of personal money judgments, they shall not recommend against tenure or non-renewal regardless of their good faith belief that certain persons should not be retained on the faculty. I simply cannot be a party to such a result. Neither Perry v. Sindermann, 408 U.S. 593, 93 S.Ct. 2694, 33 L.Ed.2d 570 (1972) nor Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) in anywise addressed the subject of damage awards relative to teacher contract rights. Those cases held that a non-tenured teacher's con-

tract non-renewal could not be denied on a basis that invaded a constitutionally protected interest such as freedom of speech. Nothing in them indicates that the contracts could not be terminated (not renewed) for entirely arbitrary reasons which did not involve the invasion of such rights. In this sphere, I utterly reject the contentions that "academic freedom" is such an all-encompassing guarantee that it precludes considerations of both subjective and objective factors in considering whether a teacher's contract should be renewed.

It is ridiculous to expect that those who are charged with the responsibility of hiring and retaining teachers for our children will not consider personal attitudes, demeanor, and teaching philosophy in relation to their compatibility with the pedagogical aims of the institution. The effect of diluting the authority of or shadowing the limits of the variety of these considerations—both subjective and objective in nature—will most certainly have its impact upon those school officials that boards of education have historically relied upon to advise on the teachers' merits for tenure status or termination for cause after tenure is achieved.

A board of education and authorized administrators must apply both *objective* and *subjective* tests and factors in the area of teacher employment, assignment and dismissal. Hetrick v. Martin, 480 F.2d 705 (6th Cir., June 15, 1973); Moore v. Board of Education of Chidester School District No. 59, Chidester, Arkansas, 448 F.2d 709 (8th Cir. 1971).

I dissent from the majority opinion's affirmance of any damage awards in favor of Smith against President Losee and Administrators Barnum and Peterson. I would hold them harmless and would assess all costs to Smith. The absence of a governing statute such as the federal Hatch Act or a state Merit System delineating political activities of education personnel (who are, I recognize, exempt under most of those statutes), does not alter Losee's legitimate good faith concern for the "good" of Dixie College. He was well aware that the "backlash" created over the Dixie Leavitt matter might well affect his requests for necessary funding from the Utah legislature on behalf of Dixie College. In my judgment Smith, as a member of the Dixie College faculty, was subject to reasonable restrictions on his First Amendment exercises if Losee and others charged with the administration of the college honestly and in good faith believed that his actions would ultimately do harm to the college. Those who would look askance at any consideration of the "subjective" test in the exercise of the discretionary duties imposed by law upon Losee, Barnum and Peterson do not move me by the use of the "chilling effect" terminology. Someone must run the railroad. If the engineers operate it in a malicious manner and in reckless disregard for the rights of others, they should be punished and discharged. I refuse to conclude that the evils of creating the "chilling effects" in the areas of First and Fourteenth Amendment rights prohibits or restrains any of the defendants-appellants before us here to formulate good faith judgments relative to Smith's tenure and contract renewal status predicated upon his known methods and philosophy. There are real-life, day-to-day problems facing school boards and administrators which the courts are not able to cope with. Dismissal of a teacher with an expectancy of re-employment by college administrators because the teacher used profane language in speeches critical of the university administration and policies has been upheld and the administrators held harmless on the ground that they sought to maintain a competent faculty and to perpetuate public confidence in the university. Duke v. North Texas State University, 469 F.2d 829 (5th Cir. 1972).

I recognize our rules that Courts of Appeal cannot overturn holdings of the trial court unless they are clearly erroneous, that appellate courts do not try cases de novo, that the resolution of conflicting evidence is particularly within

the province of the trial court, and that trial courts' findings must be given added weight when we consider the opportunity of the trial judge to hear and observe the witnesses.

With these rules in mind, I must nevertheless respectfully dissent from the majority opinion. I would hold that the trial court's findings that Losee, Barnum and Peterson acted in "bad faith", maliciously and/or wilfully are clearly erroneous. I am compelled to repeat that these officials were at all times acting in their *discretionary* capacities. In Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), the Supreme Court said:

> It is argued that an officer given the power to make decisions is only given the power to make correct decisions. * * * we have heretofore rejected the argument that official action is invalid if based on an incorrect decision as to law or fact, if the officer making the decision was empowered to do so. 337 U.S. at 695, 69 S.Ct. at 1464.

This court has held that in no event may the Court direct the manner in which discretionary acts are to be performed nor may it direct or influence the exercise of discretion in making a decision. McQueary v. Laird, 449 F.2d 608 (10th Cir. 1971). And in Newman v. Nelson, 350 F.2d 602 (10th Cir. 1965), we held that punitive or exemplary damages may be awarded in addition to actual or compensatory damages only for the purpose of punishing a wrongdoer for *willful or wanton* invasions of another's rights. Accord: Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Neither a state nor its alter ego is a citizen or person subject to suit without its consent as required by the Eleventh Amendment. State Highway Commission of Wyoming v. Utah Construction Company, *supra*. And, of course, a state is not a *person* subject to a Civil Rights suit. Williams v. Eaton, *supra*. I observe that the State of Utah is not involved directly in this action. Because that State is not a *person* subject to suit relating to Smith's claimed deprivations, I suggest that there is no constitutional authority whereby the State of Utah or any of its subdivisions or agencies may permissibly protect, either directly from the public treasury or via premiums for insurance coverage, any of the defendants-appellants from the subject damage judgments awards. Losee, Barnum and Peterson must pay Smith from their personal assets. The prospect is frightening to me—and for that reason I turn now to this record to demonstrate why I believe that the trial court was clearly erroneous. I first take note of President Losee's testimony explaining generally his reasons for not granting Smith tenure:

> Specifically I told Mr. Smith that he was too active in other people's affairs. I told him that he resented supervision, that he was critical and very vocal in being critical of anyone with any administrative responsibility at the College and that, in my opinion, he had possibilities and ability that, if he would use it in a positive manner, he could be of value, but he had seen fit to use it *in a negative manner and therefore he was not doing the College any good.* (Emphasis ours).

In the present day clamor for unrestricted freedom—meaning freedom to follow one's own wishes—any restraints thereon are looked upon with an air of alarm by many. The confrontation has all of the earmarks of a national crisis. In the case at bar, plaintiff Smith and the trial court would have us substitute the First Amendment for tenure, and would, in effect, elevate contract law to a constitutional status. College presidents and administrators are walking a veritable tightrope in their efforts to avoid confrontation with the campus aggressors, agitators and "doers", many of whom perform under the protective guise of "academic freedom". It is almost as if they are completely disassociated from the concern borne by college administrators in convincing legislators

and other public officials who control the public purse strings that a sum certain in funds is necessary to meet high educational standards which, of course, includes the payment of their salaries.

But beyond the practicalities of the problems confronting college administrators I would reverse the trial court's judgments against appellants Losee, Barnum and Peterson because I believe they are clearly erroneous as a matter of law and not based upon substantial evidence. None of the three appellants acted maliciously or wilfully toward Smith. I would dismiss the judgments and assess all costs against appellee Smith. Smith was loudly, actively and unreasonably anti-administration and disloyal to the requirements lending to the maintenance of a high standard of morale and academic upgrading for the benefit of the students at Dixie College. By affirming any damage awards against Losee, Barnum and Peterson, we do so lacking proof of malice on their parts. The risk of personal judgments in the exercise of discretion relative to contract tenure and renewal confronting persons serving in administrative positions such as appellants Losee, Barnum and Peterson will almost certainly guarantee one result: Henceforth those in like positions shall not recommend against tenure or contract non-renewal regardless of their good faith beliefs otherwise. They simply cannot afford to be wrong when error hits their pocketbooks personally. Such a result does not speak well for the future of our system. I must acknowledge that my concern relates to many officials serving in areas other than education.

The record evidences no malice or wilful disregard of Smith by Losee, Barnum or Peterson:

(1) In 1966 Smith served as the faculty representative for the Dixie College Young Democrats. During that year he actively counseled the organization which ran a series of newspaper advertisements against State Senator Dixie Leavitt, a Republican. After the campaign—Leavitt was defeated—President Losee informed Smith that he (Losee) was receiving considerable "backlash" from many as a result of Smith's activities. Losee indicated to Smith that he play less part or be less aggressive in the future. This does not evidence any malice on Losee's part. To the contrary, President Losee expressed concern for the benefit of the college in relation to the practicalities of funding requirements and simply "waved a red flag" out of concern for the realities of partisan politics.

(2) Smith's attitude toward administrators was always negative. He voted against a motion which would have permitted administrators on the campus to become members of the campus Faculty Association. He criticized the administrators in faculty meetings and in department meetings. He was in fact a trouble maker on the campus.

(3) Smith clearly interfered in the Phyllis Bell typing instructor assignment where, while serving as President of the Faculty Association, he challenged her ability to perform, even though it did not relate to his department and he made the assertions without consulting with her department head. This matter was in fact none of Smith's business, and beyond his know-how or authority. His actions brought Phyllis Bell to tears and a most distraught and anxious condition.

(4) In November of 1968, Smith came to President Losee's office at which time he questioned Losee about: (a) using work-study funds to train Losee's horses during the previous summer; (b) permitting state vehicles to be used to go to Losee's ranch home located near the college, inferentially for Losee's personal benefit; (c) permitting a member of the maintenance department at the college to take a state vehicle to his home and to deliver his two children in the vehicle to their elementary school near the college before reporting to work each morning, inferring wrongdoing; and (d) permitting the superintendent of the building and grounds to receive a "kickback" on plumbing materials purchased

from one of the local St. George, Utah, firms.

In each instance, Losee conducted a thorough and independent investigation of the charges, none of which had any merit. While Smith denied that these "matters" were accusations against Losee, he did acknowledge that they were being openly discussed on the campus. It is perfectly obvious to me that Smith was accusing Losee.

President Losee flatly denied that he had made any remarks in the presence of Mr. Laidlow or members of the president's council that Smith's non-renewal was based upon matters of a "terrible nature" which he could not divulge. Smith admitted, after his job was not renewed, that he prepared and circulated anonymous letters critical of Losee and the administration on the campus. When asked why he did not sign the letters, the court sustained an objection. The record discloses many instances of the trial court's obvious partiality in favor of Smith.

For these and other reasons evidenced by the record, I cannot and do not agree that the record reflects any harassment of or malice toward Smith by Losee, Barnum or Peterson.

WILLIAM E. DOYLE, Circuit Judge (dissenting):

I respectfully dissent. I do not have any differences with the majority opinion insofar as the facts are concerned and, indeed, I do not have any major difference insofar as the legal pronouncements contained in the majority opinion are concerned. The main difference is in the majority's application of the principles enunciated in the facts of the case.

The trial court made very extensive findings of fact. The court found, for example, that in 1969 when plaintiff was denied permanent status and was separated from Dixie Junior College, defendants Losee and Barnum made statements to faculty members that the reason for the separation was plaintiff's miscon-duct of a serious nature. At the same time, they did not explain what it was. The court found that these statements were untrue and created strong innuendos and inferences, all of which were highly defamatory in that they indicated that plaintiff was guilty of illegal or immoral conduct. The court further found that the mentioned defendants acted wilfully and maliciously. Another significant finding which should be mentioned is that the other defendants, those on the Board, failed to make any inquiry as to the actions of the defendants Losee, Barnum and Peterson, but simply affirmed their actions. The court also found that as a result of statements made and the actions taken, plaintiff was injured in his reputation as an educator and was unable to obtain a teaching position. This was the basis for the award of actual and punitive damages.

I.

A crucial issue in this case has been the scope and extent of immunity, and the Supreme Court has not spoken on this issue. It has recognized absolute immunity for judicial officers and for legislators, Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and in Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Court ruled that qualified immunity existed in favor of police officers provided they acted in good faith and with probable cause.

It is submitted that immunity in the context of a § 1983 case must be considered separate and apart from the immunity which federal officers enjoy in tort actions. *Cf.* Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) and Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). It is confusing to cite these federal cases in § 1983 cases as the majority opinion does because in the § 1983 case we are dealing with violations of constitutional rights and thus, theoretically at least, the privilege should be restricted. *See* Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966).

From an extensive search of the law in analogous situations it would appear that for a board member or officer the immunity should be a good faith exercise of discretion. *See* Briscoe v. Kusper, 435 F.2d 1046, 1057–1058 (7th Cir. 1970) which speaks of good faith and upon reasonable grounds. *See also* McLaughlin v. Tilendis, 398 F.2d 287, 290 (7th Cir. 1968) wherein the court said:

> At best, defendants' qualified immunity in this case means that they can prevail only if they show that plaintiffs were discharged on justifiable grounds. Thus here a successful defense on the merits merges with a successful defense under the qualified immunity doctrine.

398 F.2d at 290–291. *See also* Young v. Coder, 346 F.Supp. 165 (M.D.Pa.1972) and Kirstein v. Rector and Visitors of Univ. of Vir., 309 F.Supp. 184, 188–189 (E.D.Va.1970), both of which indicate objective evaluation by the trier of the facts as to whether the defendants acted reasonably. To the same effect is Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966) which speaks of discretion in terms of fair exercise of judgment based on fact and supported by reasoned analysis. Therefore, in striking a balance which will serve to protect the board members and officers from unjustified lawsuits and which will at the same time give some effect to the spirit of the Civil Rights Act, I would approve a standard of good faith, reasonable exercise of discretion; the evaluation to be made by the trier of the facts.

To allow the defendants' assertion of good faith to be conclusive on the trier of the facts will result in rendering § 1983 a nullity. The majority opinion does not do this, but it is unclear what it does and what standard a trial court is to follow. If the matter is left to the discretion of individual courts there will be a variety of decisions. Therefore, it is unfortunate that the problem has not been settled.

But even under the majority's standard the board members are subject to liability in this case because they did not investigate the facts. They merely adopted and affirmed the President's conclusion and, therefore, they are subject to liability to the extent of actual damages. As to them, the elements of the Civil Rights action are fully established. If the Civil Rights Act is to be given a grudging and parsimonious application by the expedient of expanding the immunity, it means that the Supreme Court's decisions in cases like Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) and Pickering v. Board of Education, 391 U. S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and the cases there cited mean very little. It does not seem likely that the Supreme Court would have gone to the trouble of recognizing civil rights violations in these circumstances if it had contemplated that the Act could be limited at will by expanding the immunity of the officers involved.

## II.

I do concede that the damages awarded were excessive. This does not mean though that there were no actual damages beyond out-of-pocket. The nature of the violation of constitutional rights contemplated by § 1983 is that there will be actual intangible damages such as those which result from injury to the reputation. This I see as having a similarity to the intentional tort. If a man's civil rights have been intentionally violated, he is certainly entitled to some award for humiliation or to injury to his reputation, or both. The cases arising under the Civil Rights Act which recognize damages other than punitive for injuries which attend violation of civil rights are numerous.[1]

1. *See, e. g.*, Donovan v. Reinbold, 433 F.2d 738 (9th Cir. 1970) ($5,000 compensatory damages, which included emotional and mental distress, for termination of em-

I am not lacking in sympathy for members of boards who serve the community without pay. In the past they have operated on the basis that their immunity was absolute. As is apparent from the facts in this case the defendants believed that they could act in relationship to the plaintiff here as they wished even to the extent of invading his constitutional rights without a risk of liability. Immunity should not, however, be extended to this length so as to protect against a mistake of law. The majority opinion recognizes that there is hardship in extending liability to defendants. As a result, the legal definitions are lacking in meaning. The law should be declared and applied as positively and accurately as possible and relief should be given by adjusting the damages. Instead of an award of $40,000 I would reduce the actual damages to $10,000 plus out-of-pocket loss and would order the plaintiff to file a remittitur accordingly.

ployment for exercise of First Amendment rights); Rolfe v. County Board of Education, 391 F.2d 77 (6th Cir. 1968) ($3,173.60 and $2,563.31 compensatory damages and $250 counsel fees for two teachers dismissed by superintendent of schools and county board of education); Wall v. Stanly County Board of Education, 378 F.2d 275 (4th Cir. 1967) (actual damages ordered awarded for dismissal of teacher); Jackson v. Duke, 259 F.2d 3 (5th Cir. 1958) ($5,000 damages for unlawful arrest); Sexton v. Gibbs, 327 F.Supp. 134 (N.D. Texas 1970), aff'd, 446 F.2d 904 (5th Cir. 1971) (per curiam), cert. denied, 404 U.S. 1062, 92 S.Ct. 733, 30 L.Ed.2d 751 (1972) ($500 and $250 in nominal damages against two defendants for outrage, embarrassment and humiliation for unlawful arrest); Collum v. Butler, 288 F.Supp. 918 (N.D. Ill.1968), aff'd. 421 F.2d 1257 (7th Cir. 1970) (new trial or remittitur of $11,500 ordered where verdict was returned in amount of $17,500 for beating by police officers and their refusal to allow telephone call); Rhoads v. Horvat, 270 F. Supp. 307 (D.Colo.1967) ($5,000 compensatory and $2,500 punitive damages for 30–45 minutes false imprisonment by county sheriff and deputy); Brooks v. Moss, 242 F.Supp. 531 (W.D.S.C.1965) ($3,500 actual damages and $500 punitive

for arrest, detention, prosecution and physical attack by magistrate's constable); Antelope v. George, 211 F.Supp. 657 (N.D.Idaho 1962) ($500 damages for unlawful arrest in view of willfulness of officers' conduct and of indignity and humiliation suffered by plaintiff). See also Wayne v. Venable, 260 F. 64 (C.C. A. 8th 1919); Rue v. Snyder, 249 F. Supp. 740 (E.D.Tenn.1966); McArthur v. Pennington, 253 F.Supp. 420 (E.D. Tenn.1963); 35 A.L.R.2d, Excessiveness or Inadequacy of ·Damages for Defamation, 218; id. at 273, Excessiveness or Inadequacy of Damages for False Imprisonment or Arrest; id. at 308, Excessiveness or Inadequacy of Damages for Malicious Prosecution.

There are, of course, some extraordinary cases. See Reynolds v. Pegler, 223 F.2d 429 (2d Cir. 1955) ($1 compensatory and $175,000 punitive damages for libel and slander); Gaston v. Gibson, 328 F.Supp. 3 (E.D.Tenn.1969) ($10,000 compensatory and $30,000 punitive damages for injury inflicted by law enforcement officer); Butts v. Curtis Publishing Co., 225 F.Supp. 916 (N.D.Ga.1964), aff'd, 351 F.2d 702 (5th Cir. 1965), aff'd, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ($60,000 actual damages and $400,000 punitive damages, reduced from $3,000,000, for libel and slander).