Janie McGHEE, Plaintiff-Appellant,

v.

Daniel D. DRAPER, Superintendent, Daniel D. Draper, Leroy Chamberlain, Dale Brown, Edward Billups, J. W. Puckett, and Floyd E. Mott, Defendants-Appellees.

No. 75–1901.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Sept. 23, 1976.

Decided Oct. 3, 1977.

David Rubin, Washington, D. C. (J. Stuart Lemle, Washington, D. C., on the brief), for plaintiff-appellant.

William S. Hall, Tulsa, Okl. (Green, Feldman & Hall, Tulsa, Okl., Gene A. Davis of Smith & Davis, Jay, Okl., and Larry L. French of Edwards & French, Seminole, Okl., on the brief), for defendants-appellees.

Before SETH and HOLLOWAY, Circuit Judges, and CHRISTENSEN, District Judge.*

HOLLOWAY, Circuit Judge.

This is an action by a discharged non-tenured teacher under 42 U.S.C. § 1983 seeking an injunctive order for reinstatement, damages and attorney's fees against the Board of Education for Oklahoma Independent School District # 4, the board's members, and the Superintendent of Schools, defendant Draper. The teacher alleges that as a result of unfounded rumors and gossip in the community of immorality, her teaching contract was not renewed for the 1974–1975 year; that she requested a public hearing to confront and cross examine her accusers before and after her termination; that all such requests were summarily denied; and that she was thereby denied her right of due process under the Fourteenth Amendment.

Before trial the trial court dismissed as to the School District by reason of Eleventh Amendment immunity, and this ruling is not appealed. At the conclusion of the plaintiff's case the court sustained a motion for a directed verdict for the remaining defendants on the ground that there was no claim of a property right; that no liberty interest was shown to have been involved by the evidence and no denial of constitutional rights was shown under the standards laid down in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; and that since the good intentions of

* The Honorable A. Sherman Christensen of the District of Utah, sitting by designation.

the defendants were not questioned, and there was unrefuted evidence that the board acted in good faith, the defendants were immune from damages. The plaintiff appeals this directed verdict ruling.

■ The test on such as an appeal is familiar. Although a scintilla of evidence is not enough to justify submitting a case to a jury, a verdict may not be directed unless the evidence points all one way and is susceptible of no reasonable inferences which sustain the position of the party against whom the motion is made. *Bertot v. School District No. 1*, 522 F.2d 1171, 1175–76 (10th Cir.). Thus the evidence favoring the plaintiff is of paramount importance. It is convenient to treat the facts in discussing the five main issues raised by the plaintiff's appeal—(1) the property interest claimed as a basis for procedural due process rights; (2) the liberty interest asserted for the same purpose; (3) procedural due process requirements in these board proceedings; (4) the claim that substantive due process was denied by arbitrary and capricious action of the defendants; and (5) the defendants' claim of immunity from damages.

I

THE PROPERTY INTEREST CLAIM

Plaintiff argues that rejection of her claim of denial of procedural due process was error because she possessed a property interest within the meaning of *Roth* and similar cases. More specifically she says that first the board voted on March 21, 1974, to renew her contract for 1974–75, that she had a reasonable expectation of re-employment therefrom, that 400 to 500

copies of the minutes of this board meeting were distributed throughout the community, and that defendants thereby created a legitimate claim of entitlement to renewal which could not be abridged without due process of law, which was denied. (Brief of Plaintiff-Appellant, 27–28).

During trial and in announcing his directed verdict ruling the trial court expressed the view that no property right claim had been asserted. (III R. 380, 423). However, counsel for plaintiff did argue the point that the board had first voted to renew her contract. Further, the pretrial order did pose a question of law on the legal effect of voting to renew, subsequently meeting with patrons protesting renewal, thereafter voting to "non-renew" and writing a non-renewal letter on April 5. (I R. 36). Because of some doubt whether the claim was meant to be raised and the involvement of due process, *Gomes v. Williams*, 420 F.2d 1364, 1367 (10th Cir.), we will address the issue.

At the time the board voted on the contract renewal in the spring of 1974 plaintiff was completing her second one-year contract with the school district. Under Oklahoma law the board could determine to notify plaintiff that she would not be employed for the ensuing fiscal year by registered or certified mail giving notice prior to April 10. 70 O.S.1971 § 6–101(E).[1] It was not required by state law that a statement of causes for such action be given, as is the case where a teacher has completed three years of teaching. See 70 O.S.Supp.1973 § 6–122.

■ Of course, a claim of a property right may also be premised on an implied contract and existing rules or under-

---

1. 70 O.S.1971 § 6–101(E) provides in relevant part:

A board of education shall have authority to enter into written contracts with teachers for the ensuing fiscal year prior to the beginning of such year. If, prior to April 10, a board of education has not entered into a written contract with a regularly employed teacher or notified him in writing by registered or certified mail that he will not be employed for the ensuing fiscal year, and if, by April 25, such teacher

has not notified the board of education in writing by registered or certified mail that he does not desire to be reemployed in such school district for the ensuing year, such teacher shall be considered as employed on a continuing contract basis and on the same salary schedule used for other teachers in the school district for the ensuing fiscal year, and such employment and continuing contract shall be binding on the teacher and on the school district.

standings. *Perry v. Sindermann,* 408 U.S. 593, 601–602, 92 S.Ct. 2694, 33 L.Ed.2d 570; see *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684. However, we find no tenable basis for this plaintiff to make such a claim of entitlement. The renewal vote of March 21, 1974, was followed shortly on April 2 by rescission of that action and the vote and written notice on April 5 to plaintiff of discontinuance of her services. (I R. 111). Plaintiff admits she received this notice before April 10, the statutory deadline. (See Pretrial Order, I R. 31). Without more, these circumstances did not create a background of " . . . such rules or mutually explicit understandings that support [her] claim of entitlement," amounting to a property interest. *Sindermann,* supra, 408 U.S. at 601, 92 S.Ct. at 2699. *Roth,* supra, 408 U.S. at 577, 92 S.Ct. 2701. We sustain the trial court's conclusion on this issue.

## II

## THE LIBERTY INTEREST CLAIM

Plaintiff's main argument on appeal is that the trial court erred in holding there was insufficient evidence of infringement of her "liberty" interest. She says that the trial court recognized there was a fairly good understanding by everyone as to what the community feelings were, that the board acted because of "community turmoil," that she was the victim of community gossip and rumors concerning her morality and private life, that she was never allowed to confront her accusers or afforded a due process hearing to clear her good name, and that as a direct consequence she has been unable to secure another teaching position and is unemployed. (Brief of Plaintiff-Appellant, 9–10). These contentions require careful analysis of what the evidence favorable to the plaintiff tended to show.

### a. The background evidence on the liberty interest claim

As noted, plaintiff was completing her second year of teaching at Colcord, a small community in northeastern Oklahoma.[2] In November, 1973, she was called to a board meeting where several persons made some accusations against her. One man called her a "sexpot" and said she taught sex in the classroom; his wife made similar comments and said she was unfit to teach students; another couple said she was immoral, her conduct was not fit and that she was unfit to teach students; another man called her a liar. Plaintiff testified that she denied the statements and still did at time of trial. (II R. 148–49). There was no testimony about any further developments immediately following this incident.

On March 19, 1974, defendant Draper, the superintendent, talked with plaintiff. He asked her to resign, saying it was his candid opinion she would not get enough votes to be rehired, that it would be more in her favor to resign since no questions would be asked then "as far as anything other than that which concerned my teaching ability." (III R. 250–51). Plaintiff replied she would not submit to gossip. She contacted an Oklahoma Educational Association representative, Mr. Dyer. Mr. Dyer and plaintiff then attended a board meeting on March 21 and the board voted 4–1 to renew plaintiff's teaching contract for 1974–75. (I R. 102).

At the next regular board meeting a large number of patrons and students appeared to protest the renewal of plaintiff's contract. In the auditorium, a written statement was made by one student that he checked out a book entitled "The Angel Inside Went Sour"[3] from plaintiff. Students said the book was among plaintiff's personal books in the English class library. Six students made statements about the changing of grades on report cards in plain-

---

**2.** The 1970 Census of the United States Department of Commerce shows a population of 438 for Colcord, Oklahoma.

**3.** The book was made Defendant's Exhibit 1 at trial. It is "The Angel Inside Went Sour" by Esther Rothman (Bantam Books, David McKay Co., Inc. 1972), which does contain numerous four-letter expletives.

tiff's class. Twelve patrons were listed by name as protesting the contract renewal along with "15 to 20 students," according to the board's minutes of this April 2 meeting. (I R. 106). These same minutes state that the board voted that night to rescind the earlier renewal on March 21 of plaintiff's contract. Ibid. The record shows no notice or request to plaintiff about attendance at the April 2 meeting where the rescission occurred, and she was not there. The board voted on April 2 to recess that meeting until the next night. Ibid.

On April 3 Superintendent Draper asked plaintiff to come to a board meeting that night. When she arrived students were being interviewed by the board, one at a time, and plaintiff sat in an outer office with them. Plaintiff went in last. Mr. Draper asked her if the book, "The Angel Inside Went Sour," was hers. She said it was not, that she had not seen it, and had not put it in the classroom. Mr. Draper replied that they had affidavits stating that David Hendren checked it out of her classroom. Plaintiff asked to see the affidavits but this was not permitted. The meeting was interrupted by news of the janitor's death. Plaintiff asked to be informed of the next meeting and was told this would be done, but such notice was not given her of the April 5 meeting that followed. (II R. 159–63).

The minutes of the April 3 meeting state only that Superintendent Draper talked to Hendren and three other persons about the book, "The Angel Inside Went Sour" from plaintiff's classroom, that the board voted to take no action on plaintiff's contract at that time, and that the meeting was adjourned to April 5. (I R. 105).

On April 5 the board met again without any notice or request that plaintiff appear. The minutes of that meeting state that a resolution was passed unanimously that plaintiff's contract be discontinued as of June 30, 1974, and that the board be authorized to sign a letter dated April 5 informing plaintiff of this action. (I R. 108). The letter stated only that during a special meeting on April 5 the board had voted unanimously to discontinue plaintiff's services as of the end of the year and that the letter was sent to notify her she would not be given a contract for the 1974–75 year. No reasons were given. (Id. at 111).

As noted plaintiff admits she received the letter before April 10. On April 15 plaintiff wrote the board requesting a hearing for the purpose of "stating the cause or causes for the April 2 non-renewal decision. (Id. at 112). On April 18 the board replied that it had granted the request for a hearing, which was set for May 6. (Id. at 114).

Thus, the letter and minutes from the board made no specific charges or findings against plaintiff. However, the minutes of the meeting on April 2 noted the appearance of a large group of protesting patrons, student statements about the book, statements by students about changing grades, the discussions on April 3 by Superintendent Draper with four students about the book matter, and the adverse decision on the night of April 5 when plaintiff's teaching services were discontinued.

On April 29 an attorney for the plaintiff wrote two similar letters on her behalf. One was sent to the board President, defendant Chamberlain, and one went to Superintendent Draper. Both letters contained the following statements. (I R. 63–66):

She informs me she has been granted a hearing before the Board of Education on the 6th . . . of May, 1974. *From my conversations with Miss McGhee, it would appear the reason for her dismissal relates to her moral fitness to act as a teacher of the youth of your community.* Of course, it is her position her moral and ethical standards are above reproach but apparently you and your fellow Board members are not in total accord with this. Miss McGhee feels that most of her problems stem from unfounded rumor and

innuendo from certain persons in the community.

I believe it is only fair to each side that if a fair and impartial hearing is going to be held wherein a well reasoned decision can be made by you and your fellow Board members, it would be advisable for each side to present witnesses to substantiate their respective positions with genuine supported facts which would prove or disprove the allegations against her. (Emphasis added).

At the May 6 hearing,[4] plaintiff's attorney inquired whether the book was the reason for plaintiff's discharge. Mr. Draper replied they would have 75 people the next night if the board "rescinded itself" and that they had to work with public opinion. Plaintiff's counsel asked defendant Billups if he knew anything about plaintiff's moral character, and Billups replied he knew enough to make him "sick." Repeatedly the attorney inquired about what allegation the board would like to have refuted and the members replied they were there to listen (I R. 68–70). Plaintiff's counsel asked her whether she had engaged in any immoral conduct to make her unfit to teach the children of the community, and she said she had not. (Id. at 70).

There was a statement by Superintendent Draper that he recommended that the board reverse itself "because of the book," and that he was convinced that one book had been sold by plaintiff,[5] which a teacher should not be selling. There were some responses by board members suggesting moral improprieties, but there was no charge or finding identified as the basis of the board's actions.

There was a statement by one lady adverse to plaintiff at the hearing about the plaintiff cursing students. (I R. 80). And statements were made by several persons— some students and some adults—supporting

plaintiff's ability as a teacher and protesting the board's action as based on public opinion. The board concluded the May 6 hearing held at plaintiff's request without any further action on renewal of plaintiff's contract.

The testimony at trial by Superintendent Draper and by plaintiff is significant to connection with plaintiff's claim of a liberty interest. Mr. Draper was called as a witness by plaintiff and questioned particularly about his discussion with plaintiff on March 19 about resigning. He said he had thought it would be more helpful to her to resign; that in seeking other employment, resignation is better than if the board takes action to fire a teacher; that in case of a resignation other superintendents would probably not ask more questions about the circumstances, while they would ask why a non-renewal occurred; and that it would be more difficult for her to get a job in view of circumstances and reasons in the background. (III R. 332–33). Some further points in Mr. Draper's testimony will be covered later.

Plaintiff testified at trial in August, 1975, that she was not teaching. She had applied in "maybe twelve schools." She said that sometime after the May 6 hearing she had gone to Checotah, Oklahoma, for a job interview. They asked her where she had been teaching and why she left her previous position. She told them she was "non-renewed," that it was a small town and "there had been a lot of gossip in the community, and that the issue was still being settled." There were very few further questions and they said they would get in contact with her, but never had. She also went for an interview in Tulsa or Grove and had tried to "substitute" also, in all the surrounding areas, mainly in Grove as she had earlier, but had not had any such work. She had one brief sales job and then at time of trial in August, 1975, was working for

---

4. Plaintiff made a tape recording of the board hearing of May 6 and a transcript of the hearing appears in our record. (Plaintiff's Exhibit 6, I R. 68–95).

5. He gave the book's title as "A High School Girl Went Prostitute and Made Good."

her parents at a bowling center where she owned a 2% interest but had not received any money from that employment. (II R. 193–98).

Plaintiff denied all misconduct at the trial. She denied statements in one affidavit the board had of her having been drunk; she denied knowing anything of either of the two books mentioned at the board hearings; and she denied any misconduct in connection with dope, an abortion and approval of Playboy magazine which she said one board member mentioned as having been related to him. (II R. 186–89).

b. *The trial court's views and our conclusion on the liberty interest claim*

■ The trial judge stated his reasoning in detail in granting the directed verdict for the defendants. On the liberty interest claim, the court said that *Roth* states that where a person's good name, reputation, honor or integrity is at stake because of what the Government is doing to him, notice and opportunity to be heard are essential. The judge stated the problem here concerned a public reaction rising over a two-year period; that the state law permits a non-tenured teacher to be discontinued without giving a reason for non-renewal; and that state law further requires public meetings to permit the public to appear and express opinions and "[t]hats what happened in this instance." (III R. 424–26).

In the trial court's view, a prevailing public opinion about the plaintiff was transmitted by various means to the board and "[t]he board took an action based on an unstated reason when it voted to non-renew. The letter that it transmitted and in evidence does not state any reasons, nor does it allege any charges." (Id. at 427). And the court alluded to plaintiff's testimony about her Checotah interview and her response that the 'reason she was not retained was the community opinion.

At this point, the trial court said there was no action by the board giving rise to procedural due process hearings. Thereafter the plaintiff and her attorney aggressively sought to get the board to state its unexpressed opinions, and certain members of the board did then state at the May 6 meeting why they took the action and this could very well be construed as a statement of charges as stated during that meeting. (Id. at 429–31).

The court noted in connection with the May 6 hearing that on one hand it was stated that the parties knew what the accusations were, and on the other hand, it was said they did not know the accusations and needed a statement of the charges. The trial judge said that it seemed from the undisputed evidence that there was a fairly good understanding by everyone as to what the community's feeling were. And it was noted that neither during nor after the May 6 hearing was there any request made by the plaintiff, following statements by the board members, for an additional meeting in order that "those persons then known and those actions then expressed could be refuted." (III R. 431–32).

The court concluded that the good intentions of the board were not in question and that, therefore, the motion for a directed verdict for the defendants should be sustained. (Id. at 432). The trial judge also stated that it was his belief that the evidence did not require a due process hearing and that it led to but one conclusion, "that no constitutional deprivation has been proven. . . ." (Id. at 434, 440).

On appeal, the plaintiff essentially argues that the trial court erred in holding the evidence was insufficient to go to the jury on the alleged infringement of her liberty interest; that defendants' actions rescinding the renewal of plaintiff's contract impaired her standing and associations in the community and her ability to secure other employment; that even though the letter of non-renewal did not re-state the charges against plaintiff, the charges of immorality were adopted by the board; and that the rescission of the boards previous decision to renew her contract after the public testimony of immorality imposed a stigma on plaintiff.

We must agree that the claim of involvement of a liberty interest could not be rejected by a directed verdict ruling. We note that the minutes of the April 2 meeting, said that written statements about checking out "The Angel Inside Went Sour" from plaintiff were made by three students; that statements of several other students were made concerning the changing of report card grades in plaintiff's class; and that the board voted to rescind the renewal that night. (I R. 106). The April 3 minutes reflect again discussions with students about the book and the resolution that night to discontinue plaintiff's contract. (Id. at 105). The superintendent said about 200 copies of the minutes were duplicated and that "we put them out to the public." [6] One copy went to every employee of the Colcord school; copies were left at the post office and at stores in the area. (III R. 355–56).

It is true that the board's letters and resolutions stated no charges or findings. Nevertheless, the board's minutes focused attention on the allegedly pornographic materials and improper changing of grades, and affidavits held by the board charged misconduct with male students and drunkenness, all of which plaintiff denied. (II R. 184–87). The discharge against this immediate background raised a substantial question whether the board declining to re-employ had imposed a stigma or other disability which foreclosed plaintiff's freedom to take advantage of other employment opportunities. See *Board of Regents v. Roth*, supra, 408 U.S. at 573–74, 92 S.Ct. 2701; *Codd v. Velger*, 429 U.S. 624, 627–28, 97 S.Ct. 882, 51 L.Ed.2d 92; *Colaizzi v. Walker*, 542 F.2d 969, 972–73 (7th Cir.), cert. denied, 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811. We cannot agree that the evidence pointed all one way and was susceptible of no reasonable inferences sustaining the position of the plaintiff. *Bertot v. School District No. 1*, supra, 522 F.2d at 1175–76. Hence we must hold that it was error to direct a verdict against the plaintiff for the absence of proof of a liberty interest.[7]

### III

### PROCEDURAL DUE PROCESS REQUIREMENTS

Since we are convinced that a fact issue remains on the implication of a liberty interest we face the further question whether the procedures the board followed nevertheless afforded due process. For if the procedures were sufficient as the defendants argue (Answer Brief of Defendants-Appellees, 17), the judgment for the board should nevertheless be affirmed.

The trial court held that there was no constitutional violation and apparently concluded that the board's final hearing on May 6 afforded due process. (III R. 431, 434). Plaintiff argues, however, that she was denied due process because (1) no hear-

---

**6.** It is true that at the May 6 hearing the plaintiff herself and her attorney repeatedly questioned the board members about the reasons for the non-renewal on April 5. Hence it can be said that the dissemination of information resulted from these actions of the plaintiff, as the trial court noted. However, this followed the earlier dissemination of the minutes specifying derogatory information about the plaintiff and showing the board's prompt action after its receipt. Thus this case is unlike *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684, where the plaintiff learned the reasons for his dismissal in private oral communications with his employer and demanded disclosure of unfavorable information through interrogatories in a subsequent trial.

In any event, we feel the circumstances here present a fact question whether the board's actions in effect created and disseminated an allegedly false impression about the plaintiff. Additionally, the danger of future disclosure damaging to employment possibilities, which Mr. Draper's testimony conceded, must be considered, see *Goss v. Lopez*, 419 U.S. 565, 575 n. 7, 95 S.Ct. 729, 42 L.Ed.2d 725, although he said no inquiries had been made concerning plaintiff to the time of trial.

**7.** As discussed in Part V, infra, we conclude that the directed verdict was nevertheless proper as to damages on the ground of a qualified immunity of defendants from damages in this case. However, this does not mean that further proceedings and a factual determination on the liberty interest question are mooted since equitable relief must be considered as well.

ing was held prior to the decision to rescind the board's earlier renewal of her contract; (2) the board failed to give plaintiff advance notice of the reasons for the contemplated decision; (3) defendants failed to receive evidence, thus denying the constitutional right to confrontation and cross-examination; and (4) the defendants failed to state the reasons and evidence relied on in the non-renewal decision.

*First,* we feel it unnecessary to discuss the pre-termination issue. For reasons that follow we are upholding plaintiff's remaining claims of denial of procedural due process. At this time it is only necessary to consider other essentials of due process during any future hearing which may be required. Discussion of the timing of the hearing in the past is a moot question, except when we discuss the issue of damages. See Part V, infra.

■ *Second,* we agree that where the potential of a stigma or disability to take advantage of further employment is involved, reasonable notice of the substance of the charges to be considered is required. See *Willner v. Committee On Character,* 373 U.S. 96, 105, 83 S.Ct. 1175, 10 L.Ed.2d 224; *Goldberg v. Kelly,* 397 U.S. 254, 267–68, 90 S.Ct. 1011, 25 L.Ed.2d 287; *Ferguson v. Thomas,* 430 F.2d 852, 856 (5th Cir.). That much inheres in the right to notice and opportunity to be heard, which *Roth* requires, and is clearly recognized as a part of proper notice in *Willner,* supra, 397 U.S. at 105, 83 S.Ct. 1175. We are satisfied that this plaintiff did not have reasonable notice of the charges against her.

■ It is true that some notions of the rumors and protests against plaintiff were prevalent and known to the plaintiff before the April 3 and May 6 hearings. Nevertheless, as the trial court noted the board did not make charges or identify any causes for removal which it considered. The May 6 hearing transcript reveals that a wide array of complaints was considered, including numerous items touching on morals, the books, and the plaintiff's fitness to teach students. A hearing where the plaintiff was faced with such a blast of complaints, and not

knowing which incidents she needed to discuss, did not satisfy due process.

In fact, Oklahoma law requires that in dismissing a teacher for immorality or any reason involving moral turpitude, among other things, a hearing is required with not less than ten days' prior notice of the charges and by whom they were brought. See 70 O.S.1971 § 6–103. A constitutional requirement of notice of charges is thus not an unreasonable application of due process. We merely hold that if a potential stigma and liberty interest infringement are found, it is essential that reasonable notice of the charges be given before the hearing, which was not done here.

■ *Third,* we agree that in the circumstances of this case due process required that the accusers of plaintiff, who were attacking her morality and fitness as a teacher, be heard only where plaintiff could confront and cross-examine them.

We realize that unreasonable restrictions should not be imposed as constitutional requirements. Nevertheless, here there were complaints of a serious nature concerning morality, alleged pornography, and moral fitness to teach. These were matters on which there were flat denials by plaintiff which were clearly enough "to raise an issue about the substantial accuracy" of the reports. Compare *Codd v. Vegler,* 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92. And the complaints turned on the word of numerous persons, some of whom were never heard or questioned by the plaintiff. She asked to see the affidavits but was not permitted to do so until after the final hearing on May 6.

The Supreme Court has made it clear that "procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood." *Willner v. Committee On Character,* 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224; see *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287. We are convinced that a decision based partly on undisclosed reports, which might stain a reputation and threaten a livelihood, would fall short. *McNeill v.*

*Butz,* 480 F.2d 314, 325–26 (4th Cir.). In this setting confrontation and cross-examination were essentials of due process which should not have been denied. *Thomas v. Ward,* 529 F.2d 916, 919 (4th Cir.).

■ *Fourth,* we agree that due process also required a statement of reasons for the discharge and an indication of the proof relied on. See *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287; *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484; *Staton v. Mayes,* 552 F.2d 908, 916 (10th Cir.), cert. pending. The purpose is to assure that ex parte proofs are not relied on and a reasoned decision is made. *Goldberg,* supra, 397 U.S. at 271, 90 S.Ct. 1011.

The May 6 hearing did bring out references by the board members to some derogatory information they had received and their varied impressions. It did not, however, reveal any concensus on specified reasons for plaintiff's discharge, nor leave any record for future reference of the damaging reports which were accepted and those rejected as groundless. Due process called for a statement of the basis of the decision, which was not given.

In sum, we hold that procedural due process was denied in the three respects mentioned in the circumstances of this case, if it is found that the defendants' actions imposed a stigma or disability foreclosing the freedom of plaintiff to take advantage of other employment opportunities. If it is thus found that a liberty interest was affected, then the circumstances that there were sharp factual disputes, that the matters in question touched on morality and professional capacity and plaintiff's livelihood, and that the disputed facts turned largely on the word of individuals, require the elements we have set forth as essential to due process. And, if it is found that a liberty interest was infringed, a remedy should be afforded for such denial of due process.

## IV

## THE SUBSTANTIVE DUE PROCESS CLAIM

■ Further, plaintiff argues that the trial court erred in refusing to allow the jury to consider whether the defendants violated her due process rights by terminating her employment for arbitrary and capricious reasons, even if she did not have a property or liberty interest. More specifically she claims that the testimony revealed that she had consistently denied all the community rumors, that the defendants made no effort to investigate them, that they acted arbitrarily and capriciously when they reacted to the community allegations without any regard to their truth and without any forewarning that any books were objectionable, and that no proof of the community allegations was made at trial. (Brief for Plaintiff-Appellant, 40).

*Weathers v. West Yuma County School District,* 530 F.2d 1335, 1342 (10th Cir.) and *Jeffries v. Turkey Run Consolidated School District,* 492 F.2d 1, 4 (7th Cir.), have held that where neither a liberty nor a property interest are implicated there is no basis for a claim of denial of substantive due process by a discharge for wholly arbitrary and capricious reasons.[8] In this case, we have rejected the property interest claim but have held that on remand a finding must be made on the liberty interest claim.

In determining whether a liberty interest of plaintiff was implicated, it is relevant to consider the defendants' actions in order to find whether the defendants imposed a stigma or disability on plaintiff in effecting her discharge. In that context the allegations of arbitrary and capricious action may be considered, although arbitrariness is not a necessary element in establishing that a liberty interest was implicated. And while the claim of arbitrary action depriving the plaintiff of a liberty interest may be relevant later,[8a] the plaintiff cannot assert an

---

**8.** There is no other claim of unconstitutional action such as infringement of a First Amendment right made by the plaintiff in this case.

**8a.** If a further board hearing is held, see note 17, infra, and the board takes action imposing a stigma or disability and infringing a demon-

independent substantive due process claim that an arbitrary personnel decision was made without reasons. *Weathers v. West Yuma County School District*, supra, 530 F.2d at 1342; see *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92; *Bishop v. Wood*, supra, 426 U.S. at 349–350, 96 S.Ct. 2074.

Hence, we find no error by the trial court in not submitting to the jury the separate claim of plaintiff of denial of substantive due process by arbitrary and capricious action of defendants. The only consideration that should be given to allegations of arbitrariness will be in the context of the liberty interest question, as noted.

## V

### THE DEFENDANTS' CLAIM OF IMMUNITY FROM DAMAGES

The trial judge based his ruling granting the directed verdict for the defendants in part on the basis of their good faith, as well as on other grounds discussed earlier. He stated that as he saw the case the good intentions of the board were not in question. And he said it was "the belief of this Court that there is just simply unrefuted evidence the board acted in good faith . . ." (III R. 432–33). We conclude that direction of the verdict for the defendants was proper as to damages. The overwhelming evidence demonstrated good faith by the board under the qualified immunity standard set forth in *Wood v.*

*Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214. See *Prebble v. Brodrick*, 10 Cir., 535 F.2d 605, 612; *Bertot v. School District No. 1*, 10 Cir., 522 F.2d 1171, 1184; *Smith v. Losee*, 485 F.2d 334, 344 (10th Cir.), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212.

The plaintiff's position in connection with this issue is that the trial court was not required to reach the qualified immunity issue. Plaintiff argues, however, that if there is a remand this court should address the trial court's placing on the plaintiff the burden of pleading and proof on bad faith, which is said to be in error.

We agree that the trial court seems to have followed the view that the burden was on the plaintiff to plead a lack of good faith by the board. (*E. g.*, II R. 79–80). With that view we must disagree, feeling that the burden of pleading the qualified immunity defense and of making an affirmative showing that it was applicable was on the defendants, which they satisfied. See Pretrial Order, I R. 36; *Smith v. Losee*, supra, 485 F.2d at 344; *Prebble v. Brodrick*, supra, 535 F.2d at 612; Rule 8(c), F.R. Civ.P.[9] Although the directed verdict ruling came before the defendants actually began their presentation, they were called by plaintiff and the record as developed covered the good faith issue. The issue was in the case, we feel,[10] and was one ground on which the directed verdict was granted and hence should be addressed by us.

---

strated liberty interest, the plaintiff may then assert a claim that such deprivation of liberty was without due process, resulting from wholly arbitrary action. See *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 246–47, 77 S.Ct. 752, 1 L.Ed.2d 796; *Konigsberg v. State Bar*, 353 U.S. 252, 262, 273–74, 77 S.Ct. 722, 1 L.Ed.2d 810; *Slochower v. Board of Education*, 350 U.S. 551, 557–59, 76 S.Ct. 637, 100 L.Ed. 692; *Jeffries*, supra, 492 F.2d at 4–5 and n.12.

**9.** In connection with the immunity applicable in this case, however, there may be a question whether the ultimate burden of persuasion on the issue may nevertheless be on the plaintiff after the defendants' showing raises the issue. See, *e. g.*, *White v. Nicholls*, 44 U.S. (3 How.)

266, 290–92, 11 L.Ed. 591; *Sokolay v. Edlin*, 65 N.J.Super. 112, 167 A.2d 211, 218–219; *Tuohy v. Halsell*, 35 Okl. 61, 128 P. 126, 129; *Ward v. Painter's Local Union*, 41 Wash.2d 859, 252 P.2d 253, 257–258. However, since we feel that the proof establishing good faith is overwhelming and justified a directed verdict even for the party with the burden of proof, *Pence v. United States*, 316 U.S. 332, 340, 62 S.Ct. 1080, 86 L.Ed. 1510; *Tuohy v. Halsell*, supra, 128 P. at 129, we need not decide which party has the ultimate burden of persuasion.

**10.** As stated earlier, the trial court indicated a view that the plaintiff had not raised the issue of good faith of the defendants and that it was not an issue. We agree that statements of

In determining the availability of an immunity to a § 1983 damage claim we are guided by *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128. We are required to make a "considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." Id. at 421, 96 S.Ct. at 990. While our earlier cases have already recognized the immunity in some teacher discharge cases where different constitutional claims were made, e. g., *Bertot v. School District No. 1*, supra, 522 F.2d at 1184; *Smith v. Losee*, supra, 485 F.2d at 344, we must now make the inquiry required by *Imbler* in connection with the particular claim and circumstances before us.

The constitutional claim of plaintiff in question is that the defendants denied procedural rights guaranteed as a part of due process, and that in doing so in connection with plaintiff's discharge, they imposed a stigma and disability on plaintiff to take advantage of employment opportunities. We focus on the nature of the claim that damages resulted from a stigma and disability imposed by defendants, *Roth*, supra, 408 U.S. at 573, 92 S.Ct. 2701, in looking for a common law analogue supporting the immunity defense. In this setting we find ample authority supporting a common law immunity for superintendents and board members from damages for defamation of a teacher's reputation resulting from termination of employment.[11] The immunity has been recognized in connection with published and unpublished board minutes or other public documents or proceedings of a school board,[12] and in a case involving termination of a non-tenured teacher.[13]

There is authority that the common law immunity was absolute, see 40 A.L.R.3d 490 § 5, but the defendants have only claimed a qualified immunity, and the majority view qualifies the immunity by some consideration of intent or good faith.[14]

We conclude that a qualified immunity is available here under the same standard applied in the school discipline context in *Wood v. Strickland*, supra, 420 U.S. at 322, 95 S.Ct. 992, 43 L.Ed.2d 214. The board member is not immune if he knew or reasonably should have known that his action would violate the constitutional rights of the plaintiff, or if he acted with the malicious intent to cause a deprivation of constitutional rights or other injury. The board members are not charged with predicting the future course of constitutional law and a compensatory award is appropriate only if the board member acted with such an impermissible motivation or with such disregard of the plaintiff's clearly established constitutional rights that his action cannot be characterized as being in good faith. Id. at 322, 95 S.Ct. 992; *O'Connor v. Donaldson*, 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396; see also *Mitchell v. King*, 537 F.2d 385, 389 (10th Cir.). The qualified immunity in this context is justified by the public interest in sound personnel decisions and in investigation by school boards of complaints about teaching personnel, and in the exercise of discretion in changing personnel without undue timidity.

counsel for all the parties were somewhat confusing on the point. However we feel that considering the position taken by plaintiff as a whole, and her proposed instructions submitted the day trial began which covered the good faith issue and cited the test and the decision in *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (I R. 48), the plaintiff did preserve her position that there was not good faith in the sense of the immunity so as to defeat recovery of damages. (See II R. 62–63, 76, 79–80; III R. 358–60).

11. See, e. g., *Nalle v. Oyster*, 230 U.S. 165, 182–183, 33 S.Ct. 1043, 57 L.Ed. 1439 (dictum); *McClain v. Anderson*, 246 Ark. 638, 439 S.W.2d 296; *Barton v. Rogers*, 21 Idaho 609, 123 P.

478; *Samuelson v. Vinyard*, 120 Or. 197, 251 P. 719; *Barry v. McCollom*, 81 Conn. 293, 70 A. 1035; 53 C.J.S. Libel and Slander §§ 117, 103 n. 25; 50 Am.Jur.2d §§ 205, 226; 40 A.L.R.3d 490 § 4.

12. See e. g., *Barton v. Rogers*, supra, 123 P. 478; *Samuelson v. Vinyard*, supra, 251 P. 791; *Gattis v. Kilgo*, 140 N.C. 106, 52 S.E. 249.

13. *Brubaker v. Board of Education*, 502 F.2d 973 (7th Cir.), cert. denied, 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451, and clarified, 7 Cir., 527 F.2d 611.

14. See e. g., *Samuelson v. Vinyard*, supra, 251 P. 719; *Barry v. McCollom*, supra, 70 A. 1035; *McClain v. Anderson*, supra, 439 S.W.2d 296; *Brinsfield v. Howeth*, 107 Md. 278, 68 A. 566.

Under this test we must agree with the trial court's conclusion on the qualified immunity issue and good faith. It is true that plaintiff testified, without contradiction, that at the conclusion of the April 3 hearing she was told she would be notified of the board's next meeting, and was not, and the board then voted on April 5, in her absence, to discontinue her services. However, the board did afford opportunities to plaintiff to appear at hearings in March and April before the non-renewal decision. The board faced the April 10 statutory deadline and any non-renewal notice had to be given before that or an automatic renewal occurred. And, the board quickly granted the final hearing the day after plaintiff's request of April 15 for a further hearing and at the May 6 hearing she, her counsel and her witnesses were heard.

We have held, as we feel we must at this juncture, that some vital elements of due process were not afforded at the hearings. See Part III, supra. But we make this holding *now*, after study of the evolution of due process in teacher discharge cases and with the benefit of decisions from other areas and one significant one dealing with plaintiff's major argument on confrontation and cross-examination decided in 1975 *after* this board's actions in 1974. *E. g., Thomas v. Ward*, supra, 529 F.2d 916, 919.

As noted, the board was not charged with predicting the future course of constitutional law. And damages are justified only if the board acted with impermissible motivation or with such disregard of "clearly established constitutional rights" that its actions cannot be characterized as being in good faith. *Wood v. Strickland*, supra, 420 U.S. at 322, 95 S.Ct. at 992. The 1972 decisions in *Roth* and *Sindermann* did not stake out the extent of the procedural rights which we now recognize in the circumstances of this case. We cannot hold that these were clearly established rights when the defendants' acts occurred in 1974 and that personal liability attaches for their denial.[15] Moreover, we feel that the important policy considerations underlying the qualified immunity fully justify its application in these circumstances.

In sum, we are convinced that the directed verdict was proper insofar as it denied recovery of damages against these defendants since the qualified immunity defense was clearly established in light of the proof and the state of the constitutional decisions at the time in question.

*Conclusion*

For these reasons the judgment is affirmed insofar as it did not recognize any property interest in plaintiff (Part I, supra), and insofar as it did not afford relief on an independent claim of denial of substantive due process by an arbitrary and capricious dismissal (Part IV, supra). Further the judgment is affirmed as to the denial of compensatory damages against the defendants due to their qualified immunity. (Part V, supra).

We also note that cases suggesting absolute immunity dealt with the skill of the teacher in the performance of his duties, and not the moral character of the teacher.

**15.** For example, in *Ferguson v. Thomas*, supra, 430 F.2d 852 the Fifth Circuit in a 1970 case involving a college instructor's discharge did not include cross-examination and confrontation as an element of due process. Id. at 856. The Fourth Circuit's application of cases requiring cross-examination in a high school teacher's discharge case came in 1975. *Thomas v. Ward*, supra, 529 F.2d at 919.

As noted in Part III, supra, one of plaintiff's claims is that she did not have a pre-termination hearing. It is true that the *Roth* opinion discussed "a full prior hearing" in connection with cases where a range of employment opportunities is foreclosed. See 408 U.S. at 574, 92 S.Ct. 2701; *Codd v. Velger*, supra, 429 U.S. at 633 and n.3, 97 S.Ct. 882 (Stevens, J., dissenting). However, we cannot say that in 1974 it was clear that as to *timing*, the procedures followed by the board (including the April 2 vote to rescind the renewal, the April 3 hearing where plaintiff appeared, the April 5 vote not to renew, and then the May 6 hearing) violated established constitutional rights. See *Arnett v. Kennedy*, 416 U.S. 134, 157–58, 94 S.Ct. 1633, 40 L.Ed.2d 15 (plurality opinion), 170–71 (separate opinion of Powell, J., joined in by Blackmun, J., concurring in part and concurring in result in part) (April 16, 1974).

In connection with consideration of proper equitable relief, the judgment is reversed as to the ruling that there was insufficient evidence to support plaintiff's liberty interest claim (Part II, supra), and as to the ruling that there was no denial of procedural due process. (Part III, supra). The case is remanded for further proceedings and findings on the liberty interest claim and whether a stigma or disability to take advantage of employment opportunities was imposed. If a liberty interest is found to be involved in the circumstances presented, the trial court should consider proper equitable relief for the denial of procedural due process.[16] Such relief will be for the trial court's discretion, considering the circumstances and the positions taken by the parties.[17]

Accordingly, the judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings in accordance with this opinion.

**16.** The trial court noted that some of the defendants are not presently members of the board. This fact does not bar equitable relief since the board members and the superintendent were joined when the action was commenced and substitution is automatic or may be ordered after remand. See Rule 25 F.R. Civ.P.; *Lankford v. Gelston*, 364 F.2d 197, 205 n.9 (4th Cir.); 3B Moore's Federal Practice ¶ 25.01[1], [13], ¶ 25.09[3].

**17.** Plaintiff did not pray for a new hearing by the board and her counsel stated that an order for a new hearing was not sought. (III R. 369–70). However, he said that reinstatement has been ordered in such cases because the prior proceedings were a nullity and that some opinions state that thereafter hearings may be held on charges and if they are found to be true, the board can take whatever action it deems necessary. (Id. at 415–17).

If the board specifies charges and holds a hearing affording the procedural protections discussed, it would be entitled to make a decision based on the complaints against plaintiff. If the plaintiff clears her name at such a hearing, the board may remain free to deny future employment for other reasons. *Board of Regents v. Roth*, supra, 408 U.S. at 573, n.12, 92 S.Ct. 2701.