802 F.2d 1242
 1 Indiv.Empl.Rts.Cas. 857
 Walter C. EWERS, Plaintiff-Appellee, Cross-Appellant,
Jack Jeter, Plaintiff,
v.
BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF CURRY and
Anita C. Merrill and Michael C. Gattis, Individually and in
their capacities as members of the Board of Curry County
Commissioners, Defendants-Appellants, Cross-Appellees.
 Nos. 84-2437, 84-2477.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 2, 1986.
 
 Jeffrey J. Dempsey, Cooperating Atty., American Civil Liberties Union of New Mexico (Philip B. Davis, Legal Director, with him on the brief), Albuquerque, N.M., for plaintiffs.
 Arthur P. Brock of Atwood, Malone, Mann & Turner, P.A., Roswell, N.M., and Laurie A. Vogel, Cherpelis & Associates, P.A., Albuquerque, N.M. (Steven L. Bell with them on the brief), for defendants-appellants, cross-appellees.
 Before HOLLOWAY, Chief Judge, BARRETT, Circuit Judge, and SAM,* District Judge.
 BARRETT, Circuit Judge.
 
 
 1
 The Board of County Commissioners (Board) of the County of Curry,[1] Anita Merrill (Merrill), and Michael Gattis (Gattis), hereinafter collectively referred to as appellants, appeal from a jury verdict and judgment in favor of Walter Ewers (Ewers). Ewers cross-appeals the dismissal of one of his claims.
 
 
 2
 Ewers was hired in August, 1977, as the county's first road superintendent to supervise road maintenance and advise the Commissioners generally. As a county employee, Ewers could only be terminated for good cause or if his job was abolished and he was answerable to the County Commissioners. Throughout the course of his employment as road superintendent, Ewers met with the County Commissioners twice a month at their regular meetings and he had regular contact with the Commissioners by telephone. Ewers also acted as a liaison for the County Commissioners, fielding complaints from citizens of the county and reporting such complaints back to the Commissioners.
 
 
 3
 As road superintendent, Ewers was heavily involved with cooperative road projects between the county and the State of New Mexico. Co-op projects allowed local governments to work with the State Highway Department on various road work. The Highway Department provided approximately 50% of the cost of a project in the form of funds for the purchase of materials. The local government provided approximately 50% of the cost of the project in the form of men and equipment.
 
 
 4
 In November, 1980, Gattis and Merrill, two of the appellants herein, were elected to the Board. Prior thereto, Gattis ran on a platform that called for a more efficient county government and better county roads; Merrill had determined, after attending a number of Commission meetings as a private citizen, that the county did not need a road superintendent and that the Commissioners could do that job themselves. Both Gattis and Merrill assumed the office of County Commissioner on January 1, 1981.
 
 
 5
 The first meeting of the Board to include newly elected commissioners Gattis and Merrill was held on January 5, 1981. They served with Charles Stockton (Stockton), the incumbent commissioner. Ewers did not attend the meeting due to illness. At this meeting, Stockton was elected Commission Chairman and the Board rehired all of the county's road employees except Ewers. The Board determined that it wanted to discuss the road department with him.
 
 
 6
 The next meeting of the Board occurred on January 12, 1981. During this meeting, which Ewers attended, considerable discussion was devoted to the county roads. Both Gattis and Merrill stated that they believed more attention should be given to the county's roads. At no time during the meeting, however, did the Board give Ewers any new directives as road superintendent.
 
 
 7
 The Board met next on January 19, 1981. At this meeting, the Board engaged in a lengthy discussion with Ewers about co-op projects and the time it took to complete them. Ewers was subsequently excused from the meeting. The Board thereafter, on a 2-1 vote, with Stockton in the minority, abolished the job of road superintendent effective March 1, 1981. During the evening of the same day, Stockton telephoned Ewers and related that: the Board had terminated his position; he did not believe that Merrill liked Ewers; and although Merrill wanted to fire Ewers as of that day, the Board ultimately agreed that his termination would be effective February 28, 1981.
 
 
 8
 In the six weeks that Ewers remained employed as road superintendent, the Board held two additional meetings of significance. On February 2, 1981, the Board discussed in detail with Ewers its concern over the time it was taking to complete certain co-op projects. Although Ewers attempted to explain co-op projects, the Board apparently remained confused on the operation of co-op projects. Thereafter, and at the suggestion of Ewers, the Board agreed that it would be beneficial to invite several employees of the State Highway Department to a special meeting to discuss co-op projects.
 
 
 9
 In accordance with this decision, a special Board meeting was held February 10, 1981. During the course of the meeting, Merrill expressed concern that someone was "dragging out" the co-op projects and "padding the books." Ewers responded that the statement was a lie. A State Highway Department employee stated that he did not believe that anyone had been dishonest.
 
 
 10
 Ewers' last day as county road superintendent was February 28, 1981. Thereafter, Ewers spent considerable time looking for a job but was unable to find work. Although Ewers testified that he felt he had been defamed, he acknowledged that his age, poor health, and limited education were all factors in his inability to find work.
 
 
 11
 After abolishing the job of road superintendent, the Board created the job of county manager. Although the Board failed to formally adopt a job description for the position of county manager, it is clear that the position of county manager required a college degree or the equivalent in experience. The county manager was assigned tasks by the Board, many of which were the same Ewers had performed. He was also required to supervise the courthouse service staff, perform purchasing and some budget preparation. Additionally, the Board selected a road crew employee in each district to serve as a working foreman.
 
 
 12
 Ewers subsequently sued appellants alleging that: his position as road superintendent was abolished as a pretext to terminate him in retaliation for the exercise of his First Amendment right to free speech; the Board had conspired to deprive him of equal protection of the law; the Board had deprived him of a liberty interest in his reputation; the Board had deprived him of a property right without due process of law. Within their answer, the appellants alleged that they had acted properly in eliminating the job of road superintendent in an effort to enhance the efficiency of the county.
 
 
 13
 The Board moved for summary judgment. The court subsequently entered an order in which it granted appellants' summary judgment on Ewers' claims of denial of equal protection, conspiracy, and deprivation of a property interest. The court then, after finding that Ewers had engaged in constitutionally protected speech, ruled that the case would proceed to trial on Ewers' claims of violation of First Amendment rights to free speech and deprivation of liberty interest without due process of law.
 
 
 14
 During trial, Ewers testified that: the Board abolished his job in retaliation for the exercise of his First Amendment right to free speech; the Board's decision to abolish his job was merely pretextual; and he was stigmatized by the manner in which his employment with the county was terminated and by Merrill's comments at the February 10, 1981, meeting. The Board moved for a directed verdict on Ewers' claims at the close of the in-chief case and again at the close of all evidence. In each instance, the Board argued insufficiency of the evidence. Both motions were denied. The jury subsequently returned a general verdict in favor of Ewers in the amount of $160,000. The jury also assessed punitive damages against Merrill and Gattis in the amount of $5,000 and $2,500 respectively. These punitive damages were set aside by the court because the jury did not assess compensatory damages against either Merrill or Gattis. The court awarded Ewers attorneys' fees of $39,500.
 
 
 15
 On appeal, appellants contend: (1) the court erred in submitting Ewers' First Amendment claim to the jury; and (2) the court erred in submitting Ewers' deprivation of a liberty interest claim to the jury. Within his cross-appeal, Ewers contends that the court erred in dismissing his claim for deprivation of a property interest without due process of law.
 
 I.
 
 16
 Appellants contend that the district court erred in submitting Ewers' First Amendment claim to the jury because: (a) Ewers' speech was not made as a citizen upon matters of public concern, (b) the court failed to weigh the Board's interests, (c) the balance of interests is in favor of the Board, and (d) the jury instruction did not specifically set forth the protected speech.
 
 
 17
 As set forth supra, prior to trial appellants moved for summary judgment. In its order denying appellants' motion, the court determined, as a matter of law, that Ewers had engaged in constitutionally protected speech. (R., Vol. I at 213). For whatever reason, the evidentiary materials construed by the court in making this determination are not included in record on appeal. Thus, we are unable to review appellants' allegations of error insofar as their efficacy may or may not be predicated upon evidentiary matters considered by the court prior to trial and not included in the record on appeal. See also, III, infra.
 
 
 18
 With this limitation, our determination of whether the court erred in submitting Ewers' First Amendment claim to the jury must concentrate on appellants' argument that the submission was erroneous as a matter of law because: "D. The trial court erred in submitting to the jury an instruction which did not specifically set forth the protected speech because it allowed the jury to find liability on impermissible grounds." (Appellant's Brief in Chief at 38.)
 
 
 19
 Appellants argue that the court's instruction, to which they objected, failed to set out the exact speech at issue, and failed to instruct the jury that it should consider whether such speech was a motivating factor in the decision to terminate employee Ewers as required by Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and Key v. Rutherford, 645 F.2d 880 (10th Cir.1981). Appellants contend that the net effect of the court's instruction was to indicate to the jury that all of Ewers' speech, even though not specifically identified, was constitutionally protected. We agree. We hold that the court improperly instructed the jury on Ewers' First Amendment claim and in submitting the claim to the jury.
 
 The court instructed the jury that:
 
 20
 In order to prove his claim that Defendants violated the first amendment rights, the Plaintiff must establish, by a preponderance of the evidence, each of the following elements:
 
 
 21
 1. That Plaintiff engaged in constitutionally protected speech, in that he commented about matters of public interest and concern. You are instructed that I have determined, as a matter of law, that the Plaintiff engaged in constitutionally protected speech, and that this element of his first amendment claim has therefore been established;
 
 
 22
 2. That Plaintiff's exercise of protected speech was a substantial and motivating factor in the decision of the Defendants to abolish his position as Road Superintendent; and
 
 
 23
 3. That Plaintiff's interest in commenting upon matters of public concern outweighed the Defendants' interest in restricting Plaintiff's expression of his views because such expression hampered or obstructed the efficient operation of the Road Department.
 
 
 24
 (R., Vol. I at 213.) We agree with appellants that this instruction was overly broad and could lead the jury to conclude that all of Ewers' speech was constitutionally protected.
 
 
 25
 In Mt. Healthy City Board of Education v. Doyle, the court held that "the burden was properly placed" upon the complaining party "to show that his conduct was constitutionally protected" and a "motivating factor" in the decision not to rehire him. 429 U.S. at 287, 97 S.Ct. at 576. In that case, the "conduct" in question was a telephone call to a radio station and an incident involving obscene gestures. Similarly, in Key v. Rutherford, the "conduct" which an ex-police chief alleged to be protected and a "motivating factor" in his termination was identified as "Key's communication to the mayor on his [Key's] public support for or participation in the FOP." 645 F.2d at 885.
 
 
 26
 The necessity of presenting precise evidence of the alleged protected conduct, or speech with a degree of specificity in a damage suit such as this is obvious: Jurors must be knowledgeable of the "protected conduct," (or speech) in order to find that the conduct was a "motivating factor" in the action being challenged. As the court opined in Mt. Healthy City Board of Education:
 
 
 27
 Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"--or to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.
 
 
 28
 We hold that the court's instruction on Ewers' First Amendment claim was overly broad. It allowed the jury to improperly specualte on the "conduct" (speech) which Ewers contended to be the "motivating factor" in the Board's decision to abolish the position of county road superintendent. The trial record simply does not contain any evidence of such protected speech. Thus, there was no basis in fact upon which the jury could intelligently reach a damage award. Under such circumstances, the court erred in submitting the claim to the jury.
 
 II.
 
 29
 Ewers' deprivation of a liberty interest in reputation claim was predicated upon alleged stigmatizing statements which included statements that Ewers had been "padding the books" and "dragging out" the cooperative projects. Appellants contend that the court erred in submitting the issue of deprivation of a liberty interest to the jury because there was insufficient evidence of a stigmatization in connection with the alteration of Ewers' status.
 
 
 30
 Prior to trial, the court denied appellants' motion for summary judgment on Ewers' liberty interest claim, and found:
 
 
 31
 III. Claim of Deprivation of a Liberty Interest in Reputation
 
 
 32
 In order to establish a claim of deprivation of a liberty interest in reputation under 42 U.S.C. Sec. 1983, a plaintiff must establish two things: first, that the complained of conduct stigmatized or otherwise damaged the plaintiff's reputation, and second, that the reputational damage was "entangled with some other 'tangible interest such as employment.' " McGhee v. Draper, 639 F.2d 639, 643 (10th Cir.1981), quoting Paul v. Davis, 424 U.S. 693, 701 [96 S.Ct. 1155, 1160, 47 L.Ed.2d 405] (1976)....
 
 
 33
 Of concern to the plaintiff, inter-alia, were statements by Board members that he was "padding his employees' time" and that he was "dragging out" the cooperative projects. Depo. of Ewers at 156.... Where stigmatizing charges are made at an official meeting, and the subject of the charges is not allowed a hearing to clear his name, Sec. 1983 liability may attach. See, McGhee v. Draper, 564 F.2d 902 (10th Cir.1977). Genuine issues of material fact exist with regard to whether these statements damaged the plaintiff's reputation and whether they were sufficiently entangled with the abolishing of the position of road superintendent to constitute a constitutional infringement. Summary judgment, therefore, is inappropriate on this issue. (Emphasis supplied.)
 
 
 34
 (R., Vol. I at pp. 40-41.)
 
 
 35
 At trial, appellants moved for a directed verdict at the close of Ewers' case and at the close of all the evidence. In each instance, appellants alleged insufficient evidence (R., Vol. IV at 441, et seq., and Vol. V at 553). We have carefully reviewed the entire trial record in assessing appellants' challenge to the sufficiency of the evidence on Ewers' claim of deprivation of a liberty interest.
 
 
 36
 A directed verdict is proper only when the evidence points but one way and is susceptible of no reasonable inferences which may sustain the position of the party against whom the motion is made. Casias v. City of Raton, 738 F.2d 392, 394 (10th Cir.1984). A motion for a directed verdict should be cautiously granted and the decision in a motion for a directed verdict will not be reversed unless, upon review, it is determined that the trial court's evaluation of the evidence was clearly erroneous. Brown v. Reardon, 770 F.2d 896, 903 (10th Cir.1985). Mindful of these standards, we hold that the district court erred in denying appellants' motions for a directed verdict on Ewers' liberty interest claims. The evidence, when analyzed in accordance with the court's instruction on a liberty interest violation, is insufficient to support the jury's verdict and was susceptible of no reasonable inferences to sustain Ewers' claim when appellants moved for a directed verdict.
 
 
 37
 The court instructed the jury that Ewers, in order to establish his claim for deprivation of a liberty interest, must prove by a preponderance of the evidence that: (1) defendants falsely accused him of padding time records and dragging out cooperative road projects; (2) the accusations were made in public; (3) the accusations were made in connection with the abolition of his job; (4) the accusations stigmatized him and effected his future employment opportunities; and, (5) the defendants deprived him of an opportunity for a hearing at which he could defend against the stigma which added injury to his good name, reputation, honor, and integrity. Having carefully examined the record, and giving Ewers the benefit of all reasonable inferences therein, we hold that Ewers failed to establish all of the five elements of a liberty interest violation in accordance with the court's instruction.
 
 
 38
 Initially, with respect to the first element, appellants acknowledge that Merrill and Gattis did express concern that someone was "padding the books" and that the cooperative projects were being "dragged out." We conclude that Ewers presented sufficient evidence which, if accepted by the jury, could warrant a determination that Merrill and Gattis had, in effect, falsely accused Ewers. Ewers established the second element of his alleged liberty interest violation, public disclosure, because the February 10, 1981, meeting was open to the public.
 
 
 39
 Ewers failed, however, to establish by a preponderance of the evidence, the third element of his alleged liberty interest violation: that the false accusations "were made in connection with the abolition of plaintiff's position." The Board abolished the job of road superintendent on January 19, 1981. The public accusations which Ewers contends violated his liberty interest were made three weeks after the job was abolished. Nothing in the record indicates that the statements made by Merrill and Gattis at the February 10, 1981, meeting, i.e., that someone was "padding the books" and that the co-op projects were being "dragged out," "were made in connection with the abolition of Plaintiff's position."
 
 
 40
 Even were we to assume, arguendo, that Ewers had established the first three elements of his alleged deprivation of a liberty interest, he nevertheless failed to establish the fourth and fifth elements. The court instructed the jury that the fourth element Ewers had to prove by a preponderance of the evidence in order to establish a deprivation of a liberty interest was:
 
 
 41
 That those accusations stigmatized Plaintiff in that they had the general effect of curtailing his future freedom of choice with regard to employment opportunities.
 
 
 42
 (R., Vol. I at 215.)
 
 
 43
 Although the court did not elaborate on the "stigmatization" required to establish a liberty interest violation, we believe that it is appropriate to do so. In Asbill v. Housing Authority of Choctaw Nation, 726 F.2d 1499, 1503 (10th Cir.1984), we stated:
 
 
 44
 * * *
 
 
 45
 * * *
 
 
 46
 In a series of cases, the Court has held that for an employee to make a successful liberty deprivation claim she must show that her dismissal resulted in the publication of information which was false and stigmatizing ... [A]ssuming that Thompson's statements were false and published, it is doubtful that these statements were of the magnitude that could be considered "stigmatizing."
 
 
 47
 * * *
 
 
 48
 * * *The Supreme Court has indicated that for statements to be stigmatizing they must rise to such a serious level as to place the employee's good name, reputation, honor, or integrity at stake. Board of Regents v. Roth, supra, 408 U.S. at 573, 92 S.Ct. [2701] at 2707 [33 L.Ed.2d 548] (1971). As an example, the Court has noted that a charge of dishonesty or immorality would be stigmatizing. Id. Such charges attach like a "badge of infamy" to an employee--how can they be satisfactorily explained or justified to future employers? (footnotes omitted.)
 
 
 49
 Under Asbill, statements are stigmatizing if they "place the employee's good name, reputation, honor, or integrity at stake." As such, false and public charges of "padding the books" and "dragging out" cooperative jobs, would be considered stigmatizing under Asbill because such charges would "place the employee's (Ewers) good name, reputation, honor, or integrity at stake." As such, Ewers established the stigmatizing nature of the statements under Asbill. However, the court's instruction, which is not challenged on appeal and which we do not perceive to be clearly erroneous, defined stigmatizing accusations as those which had the "general effect of curtailing his future freedom of choice or action with regard to employment opportunities." Ewers failed to establish that he was stigmatized under this instruction.
 
 
 50
 Ewers testified that he felt he had been defamed by the Board's abolishment of the job of road superintendent. However, he candidly acknowledged that although he had looked for another job, his job hunting efforts were restricted to the vicinity of his home town because his health required that he be close to a doctor and that although several jobs were available, he did not have the educational background for them. On cross-examination Ewers acknowleged that he had stated in a deposition that: one of the reasons he couldn't find work was because there were no jobs; he was unable to find work because of his health condition, and he had become disabled since he lost his job. Under these circumstances, we hold that Ewers failed to establish that the "accusations stigmatized [him] in that they had the general effect of curtailing his future freedom of choice with regard to employment opportunities."
 
 
 51
 Ewers also failed to establish the fifth element of his claim for deprivation of a liberty interest, "[t]hat the defendants deprived [him] of an opportunity for a hearing at which he could defend against the stigma and injury to his good name, reputation, honor, and integrity." Assuming that Ewers was stigmatized under Asbill by the allegations of "padding the books" and "dragging out" of projects made during the February 10, 1981, public meeting, Ewers failed to satisfy the fifth element because he was at the meeting and was afforded the opportunity to clear his name.
 
 
 52
 Due process requires the opportunity to be heard at a meaningful time and in a meaningful manner. Mathews v. Elridge, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); Armstrong v. Monzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); Miller v. City of Mission, Kansas, 705 F.2d 368 (10th Cir.1983). Ewers had notice of the statements which allegedly damaged his name because he was present when they were made. In fact, he immediately responded to them by presenting contrary views. He testified that he had been given an adequate chance to clear up any misconceptions. He was satisfied and no further opportunities to be heard were requested. None were necessary under these facts. Ewers failed to present any evidence that he was denied the opportunity for a hearing at which he could defend himself.
 
 During cross examination, Ewers testified:
 
 53
 Q. And a result--as a result of that meeting with the highway employees present, they pretty much agreed that you had done nothing wrong?
 
 
 54
 A. Yes sir, they did, they sure did.
 
 
 55
 Q. So your name was cleared?
 
 
 56
 A. Yes, sir.
 
 
 57
 Q. Thank you. And the subject of the co-op's didn't come up again much after that, did it, sir?
 
 
 58
 A. No, sir.
 
 
 59
 (R., Vol. III at 168-69).
 
 III.
 
 60
 In his cross-appeal, Ewers contends that the court erred in dismissing his claim for deprivation of a property interest without due process of law. Ewers also contends that the court erred by failing to reconsider its dismissal of his property interest claim and in refusing to instruct the jury on the claim.
 
 
 61
 We are unable to review Ewers' contention that the court erred in dismissing his property interest claim inasmuch as the evidentiary matters considered and relied on by the court in granting appellants' summary judgment motion on this claim, including Ewers' deposition, are not included in the record on appeal. See, Fed.R.App.Pro., rule 10(b), 28 U.S.C. Similarly we decline, in the absence of a complete record, to review the court's decision not to reconsider its dismissal of Ewers' property interest claim and the court's refusal to instruct on the claim.
 
 
 62
 WE REVERSE the general verdict and judgment, the subject of the direct appeal, which were rendered in favor of appellee Ewers in amount of $160,000.00 based upon Mr. Ewers' First Amendment free speech claim and his deprivation of liberty interest in reputation claim under 42 U.S.C. Sec. 1983. WE ALSO REVERSE the district court's order awarding Mr. Ewers' attorneys' fees of $39,500.00. WE AFFIRM the district court's order dismissing Mr. Ewers' claim for deprivation of a property interest without due process, the subject of Mr. Ewers' cross-appeal. WE REMAND with instruction that judgment be entered in favor of the appellants, the Board of County Commissioners of the County of Curry, Anita Merrill and Michael Gattis.
 
 
 
 *
 The Honorable David Sam, United States District Judge for the District of Utah, sitting by designation
 
 
 [1]
 Although the Board is an entity of the County of Curry, the County is not a designated party herein